[Crim. No. 21352. Jan. 25, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
MARCELINO RAMOS, Defendant and Appellant.

554

558

. . . .

COUNSEL

Alan M. Caplan, under appointment by the Supreme Court, Bushnell, Caplan, Fielding & Rudy, Quin Denvir, State Public Defender, Diane M. Griffiths, Ezra Hendon and Alice V. Collins, Deputy State Public Defenders, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney Gen-

eral, Richard D. Garske, Patricia D. Benke, Michael D. Wellington, Jay M. Bloom and Harley D. Mayfield, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**TOBRINER, J.**\*—Appellant Marcelino Ramos and his codefendant Ruben Gaitan (not a party to this appeal) were charged with two counts of robbery, one count of murder, and one count of attempted murder in connection with a robbery and shooting incident at an Orange County fast food establishment which occurred in June of 1979. A jury convicted both defendants on all counts, and found the murder and attempted murder to be of the first degree. The jury further found with respect to appellant that the charged "special circumstance" was true, i.e., that the murder was committed while appellant was engaged in the commission of a robbery. (Pen. Code, § 190.2, subd. (a) (17) (i).) It did not find the charged "special circumstance" true with respect to codefendant Gaitan.

The special circumstance finding initiated a second phase penalty trial to determine whether or not appellant should suffer the death penalty. This phase lasted approximately one week. On December 11, 1979, the jury returned a verdict of death. The appeal to this court is automatic. (Cal. Const., art. VI, § 11; Pen. Code, § 1239, subd. (b).)

The instant case is our first opportunity to consider a judgment of death imposed pursuant to the 1978 death penalty initiative approved by voters on November 7 of that year. Popularly known as the Briggs Initiative, the 1978 law contains several significant changes from the 1977 law, the constitutionality of which was approved by four members of this court in *People* v. *Jackson* (1980) 28 Cal.3d 264 [168 Cal.Rptr. 603, 618 P.2d 149]. Without offering any opinion as to other possible challenges, we have concluded that several recent United States Supreme Court cases mandate our holding unconstitutional on due process grounds the portion of the 1978 statute which requires the penalty phase jury to be instructed regarding the Governor's power to commute a sentence of life imprisonment without possibility of parole. According-

---

\*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

ly, the judgment of death must be reversed due to the use of this unconstitutional "Briggs Instruction." The judgment of guilt as to the murder, attempted murder, and robbery counts is affirmed.

## I. STATEMENT OF FACTS

Late on the night of June 2, 1979, Kathryn Parrott and Kevin Pickrell were working at a Taco Bell restaurant located in Santa Ana, California. They were due to close at 1 a.m. Just prior to that time, however, a customer later identified as codefendant Gaitan entered the establishment and placed a food order. While the order was being prepared, appellant entered. Pickrell recognized him because appellant was currently employed at the Taco Bell as a janitor. Appellant asked to check his work schedule and Pickrell admitted him to the work area behind the front counter.

Approximately a minute later, appellant emerged from the back carrying a rifle partially covered with a coat. Thinking it was some sort of joke, Pickrell began laughing, but appellant informed him that he wasn't kidding. He advised Gaitan to hop over the front counter and then directed both Pickrell and Parrott inside the restaurant's walk-in refrigerator, facing the back wall. Pickrell testified that appellant acted in a manner unlike any time he had seen him in the past, almost as though he did not recognize Pickrell or Parrott. Pickrell suspected that appellant might have been under the influence of some type of drug.

A substantial period of time elapsed during which appellant entered and emerged from the walk-in refrigerator on several occasions. He inquired about the keys to the restaurant safe and repeatedly told Pickrell and Parrott to keep quiet. When appellant entered for the last time, he instructed Pickrell and Parrott to kneel on the floor of the refrigerator and remove their hats. He told Parrott to place a rag in her mouth. During this entire period of time, Pickrell and Parrott could not see appellant because they had their backs to him.

Pickrell testified that the next thing he remembered was feeling Kathryn Parrott fall toward him. Almost simultaneously, he felt a sharp blow to the back of his head and also fell over. Sometime subsequent to that, he felt another blow to his head followed by a ringing in his ears. He testified that he never heard a gunshot or smelled smoke. He lay on the floor until he could hear no movement in the building. He then got

up, discovered Parrott's body next to him, and reported the incident to police. When police arrived, they found that Parrott was dead.

Pickrell was treated in the emergency room of a nearby hospital that night for lacerations on the back of his head. The treating physician also noted two smaller lacerations behind the right ear and a piece of tissue missing from the ear itself, which could have been caused by a glancing gunshot. The autopsy performed on the body of Kathryn Parrott indicated that she had died of a gunshot wound to the head. The examination also disclosed two lacerations to the back of the head, inflicted at or near the time of death, most probably caused by a blow from a blunt, heavy object.

Appellant and Gaitan were arrested on June 3. A search pursuant to a warrant of the apartment in which they were living yielded over $1,000, which roughly approximated the amount of money taken in the Taco Bell robbery. Additional items seized included torn pieces of a diagram of the Taco Bell restaurant and pieces of a Mexican food order form.

Trial commenced on November 26, 1979. Defense counsel presented no evidence at the guilt phase and appellant did not take the stand on his own behalf.[1] Counsel also offered no closing argument. Not surprisingly, on December 6 the jury returned a verdict of guilty as to all counts and also found the charged special circumstance to be true as to appellant. As already noted, although the jury found codefendant Gaitan guilty of first degree murder and robbery, it did not find the charged special circumstance to be true as to him.

The evidence presented by the prosecution at the penalty phase consisted of some photographs of two rifles seized during the search of the apartment, a letter and will written by appellant, and testimony by David Lam, who allegedly overheard portions of some remarks made by appellant while both men were occupying a holding cell at the county courthouse. Lam testified that he heard appellant admit shooting the victims and say that he enjoyed hearing them beg for their lives.

The presentation of defense evidence consumed the largest portion of time during the penalty phase, providing considerable background infor-

---

[1]Codefendant Gaitan testified at the guilt phase and denied any participation in either the robbery or the shootings.

mation concerning appellant's childhood and adolescence in San Antonio, Texas. He and his brother were adopted as infants. His adoptive father died when he was 8; his mother died when he was 13 or 14. From that point on, appellant and his brother (who was two years older) lived by themselves, although some supervision was provided by a maternal aunt.

Psychological testing placed appellant in the borderline retardation category, with a full scale IQ of 75. He was diagnosed as having congenital brain damage. One psychologist characterized him as borderline schizophrenic.

Testimony by friends and family in San Antonio indicated that after the death of his mother, appellant began associating with a "bad" element. His closest friend among this new group was Ruben Gaitan. Appellant's brother, Mario, testified that Gaitan became the leader of the pair because of appellant's suggestible personality. Gaitan was very excited by terrorism and terrorist-type activities; he was known to possess several weapons. Mario stated that he continually warned appellant to stay away from Gaitan but the warnings were to no avail. Mario explained that he lent his brother the money to come to California only on the condition that he would not go with Gaitan. Gaitan decided to come to California with appellant at the last moment and appellant did not resist. Testimony by several individuals indicated that both before and after leaving San Antonio, appellant was unsuccessful at holding down any job more involved than menial janitorial work.

Appellant also testified on his own behalf at the penalty phase. He admitted the robbery and shooting the victims, but he denied intending to kill them. He explained that he had hit each one on the head with a metal pipe, but that Gaitan instructed him that each must be killed to prevent their identifying appellant and himself. Appellant then re-entered the refrigerator, intending to make it look as though he had killed both Parrott and Pickrell. He testified: "My intentions were not to kill them; my intentions were to just graze them, kind of knock them out because I wasn't too sure, and since I hadn't checked them before, if they were knocked out or not, and when I walked back in, I didn't check if they were knocked out or not.... I pointed the weapon at an angled position, like upwards, to sort of graze them, and I fired the shot.... After I shot, I turned around and I looked at Mr. Pickrell, Kevin, and went in back of him about a foot away, and I fired at an angle position at him, too."

Appellant also admitted to regular and heavy use of drugs and alcohol. He recalled having ingested both amphetamines and alcohol shortly before the robbery. Psychiatric testimony suggested that drug and alcohol use would substantially exacerbate appellant's mental inadequacies and perhaps lead to unusually aggressive or hostile behavior. It was established that appellant had no prior criminal record nor any history of violence in any other setting.

We turn first to appellant's contentions that various errors during the guilt phase of his trial necessitate a reversal of the murder, attempted murder and robbery convictions.

## II. Guilt Phase Issues

### A. *Appellant's motion to suppress evidence was properly denied.*

As noted previously, appellant and codefendant Gaitan were arrested on the morning of June 3, 1979. A warrant was then obtained authorizing a search of the apartment at which they were both living at the time. Appellant argues that the evidence obtained pursuant to the search should have been suppressed on numerous grounds.

#### 1. *Supplemental statement of facts.*

At approximately 2 a.m. on June 3, Santa Ana Police Officer Buckels was assigned to investigate the robbery/homicide at the Taco Bell. When he arrived at the scene, he was informed by Sergeant Hindman that the surviving victim had identified one of the robbers as appellant. A search of the employment records at the Taco Bell yielded two possible addresses: 1313 West Tolliver and the Santa Ana Hotel on North Main Street. Appellant's employment application also indicated that the person to contact in case of an emergency was Ruben Gaitan with an address of 1331 South Bristol. The apartment number was 23__, the third digit being illegible.

After some preliminary investigation, Officer Buckels telephoned the Santa Ana Hotel and was informed by a hotel employee that appellant had checked out on May 31. Buckels then proceeded to 1313 West Tolliver at approximately 5 a.m. and questioned Joe Calderon and a Mr. Escamilla. Escamilla told Buckels that both appellant and Ruben Gaitan had lived at his residence for approximately one month after arriving in California from San Antonio, but that both had moved out

two months earlier. Calderon stated that he had gone to school with appellant and Gaitan in San Antonio. He told Buckels that the two were close friends and would probably be found together. Gaitan, he explained, worked at the South Coast Plaza Hotel on Bristol, and both appellant and Gaitan were living in an apartment complex in the 3100 block of South Bristol on the east side of the street. Calderon could provide no specific address or apartment number.

Calderon gave Buckels a description of Gaitan as a stocky, five-foot two-inch tall Mexican male, twenty to twenty five years old, clean shaven with collar length dark brown hair and a small tattoo between the thumb and forefinger of one hand. He mentioned that he had never seen either of the two with a rifle, but that Gaitan had told him that he had one. Calderon opined that if the two were in some sort of trouble, they would probably attempt to return to San Antonio.

Buckels next went to the South Bristol apartment complex at shortly after 6 a.m. but was unable to locate either appellant's or Gaitan's name on any of the mailboxes. He then returned to police department headquarters and telephoned the apartment complex manager, who told him she might be able to help him locate the two individuals whom he described to her.

Buckels then returned to the apartment complex with Sergeant Hindman at approximately 7 a.m. and contacted the manager. She explained that she believed the men he was looking for were in apartment number 231. She showed Buckels a copy of the rental application for the apartment which indicated that the tenants were named Zavala and Rubalcava. Both were listed as being employed at the South Coast Plaza Hotel.

While Buckels was speaking with the manager, Hindman informed him that an individual matching the description of Ruben Gaitan had just emerged from apartment number 231 and was proceeding down the street. Hindman and Buckels caught up with the individual, advised him that they were police officers, and asked for identification. As the individual reached for his wallet, the officers observed a small tattoo between the thumb and forefinger. From the wallet he produced an identification card from the South Coast Plaza Hotel bearing the name Ruben Gaitan. In response to questioning, he informed Buckels that he lived in apartment number 231 and that appellant and Jose Zavala

were currently in the apartment. Gaitan was then handcuffed and placed in the back of a patrol car.

When other police officers, whom Sergeant Hindman had requested, arrived, Hindman and Officer Arango approached the front door of apartment number 231. One of the other officers informed them that someone was attempting to escape via the back window to the apartment. Hindman knocked on the door, advised the residents that he was a police officer, and told them to open the door. Officer Arango, who was bilingual, also repeated the advice in Spanish. Jose Zavala opened the door and Hindman observed appellant standing behind him, matching a description police had previously constructed from several sources. Both appellant and Zavala were handcuffed and the apartment checked for other occupants. When none were discovered, the apartment was secured so that a search warrant could be obtained.

A telephone search warrant was issued by Judge Robert Knox of the West Orange County Municipal Court at 9:41 a.m. The affiant was Detective G. R. Clark of the Santa Ana Police Department. Detective Clark related the substance of the investigation which led to the arrest of appellant. Judge Knox concluded that this information constituted probable cause to search the premises at 3101 South Bristol, apartment number 231.

The warrant authorized the seizure of items in eight separate categories: "(1) guns, rifle and hand types, (2) clothing, (3) ammunition, (4) money, U.S. currency, (5) any Taco Bell papers or property, (6) personal papers of any individual, including Marcelino (NMN) Ramos inside the apartment, (7) bloody items of any type, clothing, papers, and money, (8) any papers, bills, letters addressed to occupants or visitors of this apartment."

The warrant was executed by Officer Buckels in conjunction with another Santa Ana Police Department officer and two Orange County Sheriff's deputies. The return to the search warrant indicates that several hundred items were seized, although few were ever introduced in evidence against appellant.

Appellant contends that the evidence seized pursuant to the warrant should have been suppressed on numerous grounds. He argues that the search was tainted by: (1) the illegal detention and arrest of Ruben Gaitan; (2) police violation of Penal Code section 844's knock-notice re-

quirements; and (3) the illegal arrest of appellant in violation of *People v. Ramey* (1976) 16 Cal.3d 263 [127 Cal.Rptr. 629, 545 P.2d 1333]. Appellant also urges (4) that the search categories authorized by the warrant were broader than justified by the facts contained in the affidavit; (5) that items seized during the search exceeded the terms of the warrant and lacked any "nexus" to the crime under investigation; and (6) that the warrant was invalid because it was not signed by the magistrate prior to its execution. For the reasons stated below, we conclude that while some of appellant's arguments may have technical merit, he was not prejudiced by any of the claimed errors.

### 2. *The detention of codefendant Gaitan was proper.*

■ Appellant contends that the police detention of Ruben Gaitan as he left his apartment was illegal, and thus requires that all subsequent evidence obtained by police be suppressed.[2] We conclude, to the contrary, that Gaitan's detention was an appropriate step in a reasonable police investigation.

In *In re Tony C.* (1979) 21 Cal.3d 888, 892-893 [148 Cal.Rptr. 366, 582 P.2d 957], we explained, "It is settled that circumstances short of probable cause to make an arrest may justify a police officer stopping and briefly detaining a person for questioning or other limited investigation. . . . [I]n order to justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity." We noted the converse of this standard in *People v. Moore* (1968) 69 Cal.2d 674, 682-683 [72 Cal.Rptr. 800, 446 P.2d 800] when we stated that "a police officer may not detain and question a person when there are no circumstances which would indicate to a reasonable man in a like position that such a course was necessary to the proper discharge of the officer's duties." (See also *People v. Bower* (1979) 24 Cal.3d 638, 644 [156 Cal.Rptr. 856, 597 P.2d 115].)

In the instant case, the detention of Gaitan was clearly "necessary to the proper discharge of the officer's duties." (*Moore, supra,* 69 Cal.2d

---

[2]Appellant also appears to argue that the subsequent arrest of Gaitan was illegal. But since all the information provided by Gaitan was given to police prior to arrest, the legality of the arrest would not affect the admissibility of the evidence seized pursuant to the warrant.

674.) Officer Buckels had been told by Joe Calderon that appellant and Gaitan would likely be found together. Appellant's accomplice in the robbery was as yet unidentified and police reasonably suspected that Gaitan might be involved. Calderon had given Buckels a fairly detailed description of Gaitan, and information from several sources indicated that Gaitan was currently living in apartment number 231. When an individual matching Gaitan's description left the apartment, the officers would have been remiss in their duties had they not detained the individual for questioning in hopes of locating appellant and identifying the second suspect. We therefore conclude that the detention of Ruben Gaitan was proper.

3. *Any technical failure by police to comply with Penal Code section 844 did not prejudice appellant.*

██ In the brief questioning following the detention, Gaitan identified himself and informed Officer Buckels that appellant was inside apartment number 231. Officers then knocked on the door and identified themselves as police officers. Jose Zavala voluntarily opened the door. Appellant contends that because the officers failed to articulate their purpose, they did not comply with the knock-notice requirements of Penal Code section 844.[3]

Appellant's argument is technically correct; the police officers did not literally comply with section 844's requirement that they announce their purpose. Since it is established for the purposes of section 844 that a "breaking" includes "uninvited entries through open doors [citations], even where the door is opened in response to a police officer's knock [citation]" (*People* v. *Baldwin* (1976) 62 Cal.App.3d 727, 739 [133 Cal.Rptr. 427]), the police entry here violated the literal terms of section 844.

The information used by the police in support of the contested warrant, however, was all obtained *prior to* the actual entry of the house which appellant claims was illegal. As soon as the door to the apartment was opened by Jose Zavala, police observed appellant inside. That information in itself was sufficient to support issuance of the search warrant. Accordingly, we conclude that even if failure by the police to

---

[3]Section 844 provides: "To make an arrest, a ... peace officer, may break open the door or window of the house in which the person to be arrested is, or in which they have reasonable grounds for believing him to be, after having demanded admittance and explained the purpose for which admittance is desired."

comply with the literal requirements of section 844 cannot be excused, such noncompliance did not taint the search warrant and would not necessitate the suppression of any subsequently seized evidence. (See generally *Wong Sun* v. *United States* (1963) 371 U.S. 471, 488 [9 L.Ed.2d 441, 455, 83 S.Ct. 407].)

4. *Even if police failure to secure an arrest warrant for appellant violated People v. Ramey (1976) 16 Cal.3d 263, the illegal arrest did not taint the subsequently obtained search warrant.*

■ Appellant argues that his warrantless arrest inside apartment number 231 violated *People* v. *Ramey, supra*, 16 Cal.3d 263, where we concluded that "warrantless arrests within the home are per se unreasonable in the absence of exigent circumstances." (*Id.*, at p. 276.) He contends that since the warrantless arrest preceded the obtaining of a search warrant for the apartment, any subsequently seized evidence must be ordered suppressed.

Assuming arguendo the merit of appellant's argument,[4] we note that he is still unable to demonstrate how the illegal arrest in any way facilitated the obtaining of the warrant and the subsequent seizure of evidence. The analysis is analogous to that already described with respect to the alleged violation of Penal Code section 844. (See p. 570, *ante.*) Appellant concedes that it is the *entry* of the apartment by police which gave rise to any possible illegality; *Ramey* is not violated if police merely knock on the door without an arrest warrant. When Jose Zavala opened the door to the apartment, before the police entered, the police observed an individual in plain view standing behind Zavala. It is this information connecting appellant with the apartment, obtained prior to any allegedly illegal police conduct, which formed the basis for the search warrant.[5] In fact, the telephonic affidavit in support of the search warrant did not even mention that appellant had been arrested. The affidavit merely recited, "Contact was made at the front door of

---

[4]The Attorney General argues that exigent circumstances excused police failure to obtain an arrest warrant in this case. He focuses on the time period following Gaitan's statement that appellant was presently inside the apartment and contends that the police officers should not have been expected to wait for an arrest warrant to arrive. In addition, of course, the police had previously received information indicating that if defendant were in trouble, he would probably be attempting to leave the state for San Antonio.

[5]It should be noted that police observations merely corroborated what Ruben Gaitan had told them earlier, i.e., that appellant and Jose Zavala were present in the apartment.

the apartment by officers and, upon contact, the individuals coming to the front door were identified as Marcelino Ramos and another person, by the name of Jose Zavala."

We therefore conclude that even if the warrantless arrest of appellant violated *People v. Ramey, supra,* 16 Cal.3d 263, it would not require the invalidation of the search warrant and the suppression of any evidence.

5. *Appellant does not demonstrate that he was prejudiced by any overbreadth in the search warrant's description of items to be seized.*

■ As noted previously, the search warrant issued by Judge Knox listed eight categories of items to be searched and seized. (See p. 570, *ante.*) Appellant particularly complains that categories (2) "clothing," (6) "personal papers" of appellant or any other individual, and (8) "any papers, bills, letters addressed to occupants or visitors of [the] apartment," were unnecessarily broad and in effect authorized a general exploratory search. (See *Burrows v. Superior Court* (1974) 13 Cal.3d 238, 249-250 [118 Cal.Rptr. 166, 529 P.2d 590]; *Thompson v. Superior Court* (1977) 70 Cal.App.3d 101, 112 [138 Cal.Rptr. 603].)

Even if we assume that the challenged categories were overly broad, appellant has not shown that any item of incriminating evidence introduced at trial was seized pursuant to the questioned portions of the warrant. He has thus failed to demonstrate prejudice affecting the judgment of guilt. (See *Aday v. Superior Court* (1961) 55 Cal.2d 789, 797 [13 Cal.Rptr. 415, 362 P.2d 47].)

6. *To the extent that the search exceeded the terms of the warrant, the seizure of additional items was justified by a demonstrated nexus between those items and the crime under investigation.*

■ Appellant identifies 13 specific items seized during the search and argues that the seizures were not authorized by the warrant. He recognizes the "plain view" exception to the warrant requirement which we explained in *Skelton v. Superior Court* (1969) 1 Cal.3d 144, 157 [81 Cal.Rptr. 613, 460 P.2d 485]: "When officers, in the course of a bona fide effort to execute a valid search warrant, discover articles which, although not included in the warrant, are reasonably identifiable as contraband, they may seize them whether they are initially in plain sight or come into plain sight subsequently, as a result of the officers'

efforts." (See also *People* v. *Superior Court* (*Meyers*) (1979) 25 Cal.3d 67, 73-74 [157 Cal.Rptr. 716, 598 P.2d 877].) Appellant contends, however, that the *Skelton* exception is inapplicable because the items seized were not reasonably identifiable as contraband or other seizable evidence.

The seized items identified by appellant include: (1) a black cloth with two cutouts which appeared to be a mask; (2) a five-inch long cylinder of screening material which officers believed to be a silencer; (3) an unfired .30-caliber carbine round; (4) two books: Anarchists Cookbook and Poor Man's James Bond; (5) a notebook entitled "The Private Journal of Ruben Gaitan, aka Frank Rodriguez"; (6) a firing mechanism from a .32-caliber M-1 rifle; (7) gun stocks; (8) a four-by-fifteen telescopic sight; (9) a spiral notebook with the initials "M.R."; (10) a two-page letter entitled "To My Brother"; (11) a hand-written page entitled "Last Will of Romo"; (12) torn pieces of paper which appeared to be a diagram (later turned out to be a drawing of the Taco Bell); (13) a torn order form for Mexican food.

The Attorney General responds by noting that many of the challenged items arguably fall within properly drawn categories of the search warrant. Items (3), (6) and (7) clearly constitute firearms and ammunition (search warrant categories one and three). Respondent also asserts that items (2) and (8) fall within a reasonable interpretation of those categories. Items (5), (9), (10) and (11) seem to be personal papers within the sixth category of the warrant. This leaves items (1), (4), (12) and (13). **(6)** The record does not reflect that items (1) and (4) were ever introduced into evidence during either the guilt or penalty phases and appellant does not suggest otherwise.[6] He is thus unable to meet his burden of establishing prejudice even if they were improperly seized.[7] ■ The necessary nexus for the other two items is patently obvious. A Mexican food order form (item (13)) was clearly relevant to establish a connection to a Taco Bell robbery. And although the exact nature of the Taco Bell diagram (item (12)) may not have been ascertainable to the searching officers, it was definitely suspicious and its seizure was reasonably necessary in order to establish its evidentiary value.

---

[6]It also appears that items (2), (4) and (9) were not introduced into evidence.

[7]The Attorney General argues that item (1) was clothing (category two of the warrant) and that the searching officers might reasonably suspect that a mask was used in the robbery, although there was no evidence to that effect. He contends that item (4) (the two books) consisted of materials dealing with terrorism and terrorist activities which were seized to establish a possible motive for the robbery.

It therefore appears that only some of the challenged items were introduced into evidence, and that those items were either validly seized pursuant to the warrant or were reasonably believed to have some connection to the crime being investigated. In addition, even if some of the items had been erroneously admitted, it would be impossible to conclude that such admission was prejudicial in view of the overwhelming evidence tying appellant to the commission of the robbery and the homicide.

7. *Trial counsel did not err in failing to object to the telephonic search warrant procedure used in the present case.*

█ Appellant alleges that his trial counsel was incompetent for failing to object to the telephonic warrant procedure because such procedure was defective due to the magistrate's failure to personally sign the warrant prior to its execution. The contention is spurious.

In the present case, Detective Clark provided Judge Knox with an oral statement which the judge found sufficient to constitute probable cause to search. Detective Clark had prepared a written duplicate warrant which he read to Judge Knox. The judge approved the warrant and instructed Detective Clark to sign his (Knox's) name to the warrant. This duplicate original warrant was in Officer Buckel's possession when he executed the search.

The procedure utilized here is specifically authorized by Penal Code sections 1526, subdivision (b) and 1528, subdivision (b). Appellant's reliance on *Bowyer v. Superior Court* (1974) 37 Cal.App.3d 151 [111 Cal.Rptr. 628, 112 Cal.Rptr. 266] is misplaced. *Bowyer* merely held that the officer/affiant must prepare a duplicate original warrant and that such warrant must be in existence at the time the magistrate authorizes the officer to affix his signature. (*Id.*, at pp. 163-164 and fn. 11.) That requirement was clearly complied with in the present case. Accordingly, trial counsel was not incompetent for failing to object to the procedure.

B. *The prosecutor was not guilty of prejudicial misconduct in either his opening statement or his closing argument.*

In his opening statement, the prosecutor told the jury, "The evidence in this case will show that Mr. Ramos and Mr. Gaitan premeditated and planned the execution of those two young people in the Taco Bell, with no doubt at all." Counsel for both defendants objected, contending

that the prosecutor was arguing ultimate facts under the guise of an opening statement. The objection was overruled by the trial judge, who concluded that the prosecutor was "entitled to state his theory and how the evidence will fit the theory."

■ The purpose of an opening statement "is to prepare the minds of the jury to follow the evidence and to more readily discern its materiality, force and effect." (*People* v. *Arnold* (1926) 199 Cal. 471, 486 [250 P. 168]; see also *People* v. *Green* (1956) 47 Cal.2d 209, 215 [302 P.2d 307].) It is difficult to conceive of how the prosecutor can accomplish this function if he is not entitled to state his theory of the case in terms of the requisite elements of the crime. But even were we to accept appellant's contention that there was a technical error here, it is inconceivable that such error resulted in prejudice to him. (See *People* v. *Strickland* (1974) 11 Cal.3d 946, 955 [114 Cal.Rptr. 632, 523 P.2d 672].)

■ Appellant also contends that the prosecutor committed misconduct during his closing argument by suggesting that appellant had the burden of raising a reasonable doubt as to his guilt. A review of the total statement in context reveals that this claim is meritless.[8] The totality of the prosecutor's statement made clear what the proper standard was and how it was to be applied by the jury. Under the circumstances here, there was no prejudicial misconduct.

C. *The trial court's comments regarding possible jury verdicts did not constitute prejudicial misconduct.*

Appellant claims that some of the trial court's comments during voir dire regarding possible jury verdicts were prejudicial and require a reversal of his conviction. On several occasions, the judge discussed the jury's obligation to decide between first and second degree murder in the event of a conviction, but did not mention the possibility of a manslaughter verdict or of a hung jury.

---

[8]The prosecutor argued as follows: "Now, *the defense in this case has failed to raise a reasonable doubt*, and I say that because after Mr. Pickrell has testified, and all of the other witnesses have testified, there is no question in this case but that the people in this case on trial are guilty of the crime.

"Reasonable doubt, which you will undoubtedly hear, is defined as follows: A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown he is entitled to a verdict of not guilty.

"*This presumption places upon the State the burden of proving him guilty beyond a reasonable doubt*." (Italics added.)

██ Appellant failed to object to the court's comments when made, however, and a challenge to allegedly improper remarks generally may not be raised for the first time on appeal, particularly when, as in this case, a timely objection may have obviated any problem by permitting the court to clear up any misunderstanding that his comments may have elicited. (See, e.g., *People v. Langdon* (1959) 52 Cal.2d 425, 434 [341 P.2d 303]; *People v. Lanphear* (1980) 26 Cal.3d 814, 836-837 [163 Cal.Rptr. 601, 608 P.2d 689].) In any event, in view of the state of the evidence, we do not believe that there is any reasonable probability that the comments prejudiced the appellant.

D. *Any errors in the admission of evidence at the guilt phase were not prejudicial.*

1. *Photos taken inside Taco Bell.*

██ Defendant claims that the trial court erred in admitting three photographs taken inside the Taco Bell after the crime. A picture of Kathryn Parrott's body was offered to show the position of the victims at the time of the shooting, supporting the prosecution's claim of an "execution-type" murder. A second picture of the body showed the position of the victims' hats, which appellant had allegedly asked them to remove. The third photograph revealed bloody fingerprints on a door jamb and was admitted to demonstrate appellant's movements during the commission of the crime. Appellant contends that the photographs were irrelevant, cumulative and prejudicial and that they should not have been admitted.

The photographs at issue, disclosing and corroborating the manner in which the crime was committed, were clearly relevant to the issue of malice. (See *People v. Jackson* (1980) 28 Cal.3d 264, 302 [168 Cal.Rptr. 603, 618 P.2d 149]; *People v. Frierson* (1979) 25 Cal.3d 142, 171 [158 Cal.Rptr. 281, 599 P.2d 587].) Under Evidence Code section 352, however, a trial court may exclude relevant evidence if the danger of prejudice created by the evidence outweighs the evidence's probative value. Appellant maintains that the trial court abused its discretion under section 352 in admitting the photos.

Our past cases make clear that a trial court's refusal to exclude otherwise admissible photographs under section 352 will not be disturbed on appeal unless the prejudicial effect clearly outweighs the photos' probative value. (See *People v. Pierce* (1979) 24 Cal.3d 199, 211 [155

Cal.Rptr. 657, 595 P.2d 91]; *People* v. *Murphy* (1972) 8 Cal.3d 349, 363 [105 Cal.Rptr. 138, 503 P.2d 594].) In the present case, the photos in question are not unduly gory or gruesome and the trial court could properly find that each of the photographs provided sufficiently significant corroboration of Pickrell's testimony to outweigh any potential prejudice. We note that the trial court excluded an additional photograph of Parrott's body taken at the scene of the killing after a police officer had turned her body over. We find no abuse of discretion in the challenged rulings.

2. *Photo of victim while alive.*

■ Appellant next challenges the trial court's admission of a photograph of Kathryn Parrott taken while she was still alive. The photograph was identified by Parrott's father in testimony before the jury.

When the prosecution offered this photograph into evidence, defense counsel objected to its admission as irrelevant and prejudicial. Counsel stated that defendant would stipulate that Kathryn Parrott was a human being and that she had been alive on June 2d and was found dead on June 3d. Given these stipulations, appellant maintained that the photograph was not relevant to any contested issue and suggested that the prosecution's only purpose in seeking to introduce the picture was "to humanize [Parrott] and make the jury feel sorry for her." After viewing the picture the trial court indicated that it could not see how the picture would prejudice the defendant, and admitted the photo into evidence.

In our recent decision in *People* v. *Hall* (1980) 28 Cal.3d 143, 152 [167 Cal.Rptr. 844, 616 P.2d 826], we noted that ordinarily "if a defendant offers to admit the existence of an element of a charged offense, the prosecutor must accept that offer and refrain from introducing evidence . . . to prove that element to the jury." In light of the defendant's stipulation in this case, the prosecutor cannot plausibly maintain that the introduction of the photograph was needed to demonstrate either that Parrott was a human being within the meaning of Penal Code section 187 or that she was alive prior to the events of the night in question.

Although neither party has directed our attention to any prior criminal case in which the admissibility of a similar photograph of the decedent was in question, in *O'Meara* v. *Haiden* (1928) 204 Cal. 354,

366 [268 P. 334, 60 A.L.R. 1381], our court addressed a comparable issue in the context of a wrongful death action. In *O'Meara*, as in this case, the photograph of a young decedent was identified by the decedent's parent before the jury and was introduced into evidence. In concluding that the admission of such evidence was erroneous, our court stated in *O'Meara*: "There was no dispute as to the identity of the boy injured. Just what was the purpose of offering in evidence his photograph is not apparent from the record, unless it was to unduly prejudice the jury in favor of the plaintiff. The reporter's transcript shows that the mother wept as she identified her son's picture. The effect of such procedure cannot aid in the rendition of a just and fair verdict by the jury, which should be the purpose of all trials by jury. To permit the introduction of the dead boy's photograph under the circumstances shown in this action was undoubtedly error...." (See also *Armenta* v. *Churchill* (1954) 42 Cal.2d 448, 459 [267 P.2d 303]; cf. *Westberg* v. *Willde* (1939) 14 Cal.2d 360, 371 [94 P.2d 590].) Courts in other jurisdictions have reached similar conclusions when the proffered photograph has had no bearing on any contested issue in the case. (See generally Annot. (1960) 74 A.L.R.2d 928.)

By analogy to these past authorities, it appears that the trial court erred in admitting the photograph at issue. Under the facts of this case, however, it is clear that the error was not prejudicial. As we have seen, from the evidence presented at the guilt phase this was not a "close case" in which the jury's sympathy for the victim may have led it to improperly convict appellant; the evidence of defendant's participation in the crimes was clear and uncontradicted. Accordingly, the admission of the photograph does not warrant reversal.

### 3. *Testimony of victim's father.*

 The victim's father testified at trial to conversations he had with his daughter about the possibility of a robbery occurring at work, stating that "she had said she wouldn't argue, wouldn't fight...." Appellant objected to the introduction of this testimony on relevancy grounds, and now contends that the evidence should have been excluded.[9]

As the People suggest, the trial court could properly have found that the proffered testimony was relevant to the prosecution's claim that the

---

[9] Defendant failed to make any hearsay objection at trial, and consequently may not object to the evidence's admission on that ground on appeal. (See Evid. Code, § 353.)

murder in this case was a deliberate, premeditated murder and was not spontaneously precipitated by any resistance or aggressive conduct on the part of the victim. Evidence that Parrott had intended to offer no resistance to any robbery attempt would tend to show that she acted consistently with such preexisting intent and would tend to corroborate Pickrell's testimony to that effect. Accordingly, appellant's relevancy objection was properly overruled.

### 4. *Evidence of victims' reactions during robbery.*

At trial, Pickrell testified to a conversation the two employees had while they were held in the walk-in refrigerator during the robbery.[10] Appellant objected to the admission of the testimony on relevancy and hearsay grounds, and he renews those objections on appeal.

Neither of the objections has merit. First, the conversation in question, in which the employees spoke of their fears during the robbery, was clearly relevant to the element of "force or fear" necessary for a robbery conviction. Second, appellant's hearsay objection founders on the "state of mind" exception to the hearsay rule embodied in Evidence Code section 1250. Under that provision, evidence is not made inadmissible by the hearsay rule when offered "to prove the declarant's state of mind, emotion, or physical sensation" at the time of the statement. In this case, the statements at issue clearly tended to prove the victims' fear during the commission of the crime, a "state of mind" which we have seen was directly at issue in the robbery charge.

Appellant also argues that the trial court committed prejudicial error in failing to instruct the jury that the testimony was not to be used to show the truth of the matter asserted, allegedly leaving the impression that the confined employees had some basis in past experience with the appellant to believe he was capable of murder. The suggested inference, however, does not naturally follow from the statement in question. In any event, appellant fails to show that any possible error resulted in a miscarriage of justice. (See Cal. Const., art. VI, § 13; *People v. Green* (1980) 27 Cal.3d 1, 26 [164 Cal.Rptr. 1, 609 P.2d 468].)

---

[10]The key portion of the testimony in question is Pickrell's statement that: "Well, I told her that he was probably going to kill us because we knew him, and then she just said 'Well, pray to God.'"

### 5. *Testimony regarding disassembled gun.*

In cross-examining codefendant Gaitan, who claimed on direct examination that he had not been present at the Taco Bell at the time of the robbery, the prosecutor asked whether he had noticed a gun in the apartment when he returned there in the early morning hours on the date of the crime. Gaitan initially answered "Well, no," but then volunteered information about the presence of a disassembled gun in the closet of the apartment. Appellant did not move to strike the testimony and the prosecution did not pursue the issue.

▉▉▉ As appellant suggests, evidence of possession of a weapon not used in the crime is ordinarily not admissible (see *People* v. *Lo Cigno* (1961) 193 Cal.App.2d 360, 379 [14 Cal.Rptr. 354]), and in this case the prosecution did not present evidence demonstrating that the disassembled gun might have been the weapon used in the robbery. The testimony concerning the disassembled gun was very brief, however, and in view of the strong uncontradicted evidence that the defendant had used a gun during the commission of the robbery, this evidence, even if improperly solicited, was not prejudicial.

### 6. *Admission of Gaitan's employment application.*

▉▉▉ Appellant objects to the admission of an employment application of codefendant Gaitan which, along with four other handwriting exemplars, was introduced to prove that the food order found in the Taco Bell was written by Gaitan. The employment application was verified by the personnel director of the South Coast Plaza Hotel, who testified that Gaitan had worked at the hotel and that his employment application had been filled out when Gaitan came to the personnel office. The personnel director could not specifically recall, however, whether she had personally seen Gaitan fill out the application, and defendant now argues that the trial court should have excluded the document for lack of a proper foundation.

Evidence Code section 1418 provides that "[t]he genuineness of writing ... may be proved by a comparison made by an expert witness with writing (a) which the court finds was admitted or treated as genuine by the party against whom the evidence is offered or (b) otherwise proved

to be genuine to the satisfaction of the court."[11] In this case, the personnel director's testimony established that Gaitan was personally present when the application on his behalf was filled out, and in the absence of any contrary indication we believe that the trial court could properly admit the document for use as a comparison handwriting exemplar. Moreover, it is clear in any event that the evidence was not prejudicial, because the handwriting on the Taco Bell order was additionally linked to Gaitan through the use of exemplars taken directly from Gaitan by one of the numerous handwriting experts who testified at trial.

### 7. Cumulative effect.

■ Finally, appellant asserts that even if none of the alleged errors was individually important enough to affect the outcome of the case, their cumulative effect was prejudicial requiring reversal of his conviction. (See, e.g., *People* v. *Vindiola* (1979) 96 Cal.App.3d 370, 388 [158 Cal.Rptr. 6]; *People* v. *Williams* (1971) 22 Cal.App.3d 34, 45 [99 Cal. Rptr. 103].) In this case, however, the evidence against appellant at the guilt phase was more than substantial, including most significantly the positive identification by the surviving victim. Even if all of the challenged evidence had been excluded, we do not think that the outcome of the guilt phase would have been affected. Therefore, any possible error did not result in a miscarriage of justice. (See Cal. Const., art. VI, § 13.)

### E. *Appellant was not prejudiced by any alleged instructional error in the guilt phase.*

#### 1. Obligation to give sua sponte accomplice instructions.

■ Appellant claims that the trial court erred in failing to instruct the jury *sua sponte* that an accomplice's testimony must be corroborated and should be viewed with distrust. He claims that the absence of such instructions was prejudicial because Gaitan gave damaging testimony concerning appellant's planning of the robbery.

Although in a proper case a trial court may be required to give *sua sponte* instructions to guide the jury in evaluating an accomplice's testi-

---

[11]Contrary to defendant's contention, the provisions of section 1271, governing the introduction of a document as an exception to the hearsay rule, are not applicable here because the document was not introduced to prove the truth of its contents, but simply as evidence of Gaitan's handwriting.

mony (see, e.g., *People* v. *Gordon* (1973) 10 Cal.3d 460, 466-469 [110 Cal.Rptr. 906, 516 P.2d 298]), in *People* v. *Terry* (1970) 2 Cal.3d 362, 398-399 [85 Cal.Rptr. 409, 466 P.2d 961], we explained that when, as here, a codefendant testifies that he was not involved in the crime—and thus that he was not an accomplice—the trial court may properly conclude that the giving of accomplice instructions might improperly prejudice the codefendant's case. *Terry* indicates that in such a situation the giving or withholding of such instructions lie within the sound discretion of the trial court. In view of the fact that Pickrell's testimony obviously provided adequate corroboration of Gaitan's testimony against the appellant, we conclude that the trial court did not abuse its discretion in declining to give the accomplice instructions *sua sponte* in this case.

2. *Instruction on assault with a deadly weapon.*

▮ Appellant claims that the trial court erred in failing to instruct the jury *sua sponte* on the crime of assault with a deadly weapon. Whether or not assault with a deadly weapon is a lesser included offense when a defendant is charged both with robbery and a "use" allegation, a trial court, as we explained in *People* v. *Flannel* (1979) 25 Cal.3d 668, 683-686 [160 Cal.Rptr. 84, 603 P.2d 1], is required to give such an instruction only if there is substantial evidence to support a jury's determination that the defendant was in fact only guilty of the lesser offense.

In this case, contrary to appellant's contention, there is no evidence from which the jury could reasonably conclude that defendant was only guilty of assault with a deadly weapon and not robbery. The evidence pointed unmistakably to the fact that appellant had taken money from the Taco Bell; appellant had presented no evidence to suggest that he did not have the specific intent to steal. (Cf. *People* v. *McGreen* (1980) 107 Cal.App.3d 504, 512 [166 Cal.Rptr. 360].) Under these circumstances, the trial court did not err in failing to instruct on assault with a deadly weapon.

3. *Instructions on circumstantial evidence and specific intent.*

In addition to being convicted of the charged substantive crimes, defendant was found to have intentionally inflicted great bodily injury upon Pickrell, a finding which subjected appellant to a three-year enhancement of his punishment under Penal Code section 12022.7.

 Appellant contends that this enhancement finding should be reversed because the trial court did not specifically inform the jury that CALJIC No. 2.02 (1979 rev.), delineating the conditions under which specific intent may be proved by circumstantial evidence, was applicable to the jury's determination of specific intent with respect to the enhancement. (See *People* v. *Salas* (1976) 58 Cal.App.3d 460 [129 Cal.Rptr. 871].)

We think it clear that appellant suffered no prejudice from the trial court's omission. The jury in this case was generally instructed on the principles embodied in CALJIC No. 2.02 with respect to the substantive crimes, and the jury was also informed to consider all the instructions as a whole and to regard each in light of all the others. Under these circumstances, it is not reasonably probable that the jury was confused as to the proper use of circumstantial evidence in connection with the enhancement finding. (See *People* v. *Radil* (1977) 76 Cal.App.3d 702, 707-709 [142 Cal.Rptr. 233].)

### 4. *Instructions on the crime of attempted murder.*

 Appellant was not only convicted of the murder of Kathryn Parrott, but also of the attempted murder of Kevin Pickrell. Instructing the jury on the latter offense, the court stated that "an attempt to commit a crime consists of two elements, namely, a specific intent to commit the crime and a direct but ineffectual act towards its commission." It then instructed the jury that it could find defendant guilty of murder on any of three theories: express malice, implied malice, or felony murder. The court neglected, however, to inform the jury that the crime of attempted murder requires a specific intent to kill, a mental state coincident with express malice but not necessarily with implied malice or felony murder. The jury instructions thus implied that the jury should find appellant guilty of attempted murder if it determined that appellant intentionally committed an act which, were the victim to die, would consitute murder on an implied malice or felony-murder theory. As we explained recently in *People* v. *Murtishaw* (1981) 29 Cal.3d 733 [175 Cal.Rptr. 738, 631 P.2d 446], such instructions are inadequate.[12]

---

[12]Murtishaw involves a conviction for assault with intent to commit murder, a crime virtually indistinguishable from attempted murder. Indeed, under legislation effective January 1 of last year (Stats. 1980, ch. 300, §§ 1-2) the separate crime of assault with intent to commit murder has been eliminated, so that all acts which formerly could have been prosecuted under that rubric are now prosecuted as attempted murders. Thus, *Murtishaw*'s analysis of the jury instructions appropriate to the crime of assault with intent to commit murder applies with undiminished force to the present case.

The instant case also resembles *Murtishaw*, however, in that we are unable to accept appellant's contention that the instructional error complained of was prejudicial. Viewing as we must the record at the guilt phase independent of any evidence subsequently presented at the penalty phase,[13] it is not reasonably probable that the jury would have returned a more favorable verdict in the absence of the instructional error. (See *People* v. *Murtishaw, supra,* 29 Cal.3d at p. 765.)

F. *Trial counsel did not render ineffective assistance in failing to present a diminished capacity defense at the guilt phase.*

■ As previously noted, appellant's trial counsel elected to present no defense at the guilt phase and made no closing argument to the jury. Appellant asserts that he was denied effective assistance due to counsel's failure to adequately investigate, develop and present a diminished capacity defense. He points particularly to the fact that an important psychological test was not administered until the day before the administering psychologist testified at the penalty phase.[14] The test results indicated that appellant suffered from mild congenital brain damage. Appellant argues that had this information been available prior to the guilt phase, it would have suggested a potentially meritorious diminished capacity defense.

In *People* v. *Frierson* (1979) 25 Cal.3d 142, 164 [158 Cal.Rptr. 281, 599 P.2d 587], this court stated that "in a capital case, where diminished capacity appears to be the *sole* potentially meritorious defense, and counsel has in fact elected to present such a defense at trial, counsel must be expected to take those reasonable measures to investigate the factual framework underlying the defense preliminary to the exercise of an informed choice among the available tactical options, if any." (Italics in original.) Although appellant purports to rely on *Frierson,* the case is readily distinguishable on its facts. As noted, defense counsel in *Frierson* elected to present a diminished capacity defense but decided to do so without the benefit of expert psychiatric witnesses. Appellant's counsel decided that a diminished capacity defense was inappropriate to

---

[13]The prosecution case at the guilt phase strongly indicated that appellant attempted to kill the two witnesses to the robbery. Intent was inferable from the circumstances of the crime. Since appellant presented no evidence at the guilt phase, there was no substantial basis from which the jury could conclude otherwise. All of the evidence suggesting that appellant may not have entertained an intent to kill was presented during the penalty phase.

[14]The Halsted-Reitan test was administered to appellant by Dr. John Haberland of the University of California at Irvine Medical Center on December 17, 1979.

the facts of this case. Therefore, it is the propriety of counsel's decision not to present the defense which must be evaluated.

Appellant's argument implies that the investigation which is a necessary predicate to such a decision either did not occur or occurred too late to be of value. The record fails to support such an implication. Psychiatric examination of appellant by a defense psychiatrist was authorized by the trial court over two months prior to commencement of the guilt phase. Another defense psychiatrist conducted a series of seven examinations beginning September 19 and continuing through the first week of November. Numerous psychological tests were conducted during these examinations. On two occasions during October, appellant was transported from the Orange County jail to the University of California Medical Center in Irvine for neurological examinations. Tests of an undisclosed nature were also conducted at St. Joseph's Hospital of Orange on October 24. On these facts, appellant is unable to sustain his burden of proving that trial counsel failed to adequately investigate the possibility of a psychiatric defense.

Moreover, trial counsel's decision not to present a diminished capacity defense cannot be said to have deprived appellant of effective assistance. None of the psychiatric evidence accumulated by counsel either before or after the guilt phase suggested that appellant was incapable of forming the intent to steal. (See, e.g., *People v. Frierson, supra*, 25 Cal.3d at p. 155; *People v. Mosher* (1969) 1 Cal.3d 379, 391-393 [82 Cal.Rptr. 379, 461 P.2d 659].) Since the prosecution's first degree murder case was presented to the jury on a felony-murder theory as well as a premeditation theory, additional evidence of diminished capacity would have been largely irrelevant. Counsel could have properly concluded that such psychiatric evidence as was available should be saved for the penalty phase in an effort to persuade the jury that appellant was an inappropriate candidate for the death penalty. Under these circumstances, we will not proceed to second-guess trial counsel's choice of tactics. (See *People v. Lanphear* (1980) 26 Cal.3d 814, 828 [163 Cal.Rptr. 601, 608 P.2d 689].)

G. ▮▮▮ *There is substantial evidence to support the jury's findings that appellant personally used a firearm and that the murder was committed in the course of the robbery.*

A review of the record indicates that appellant's sufficiency-of-the-evidence claims are spurious. (See generally *People v. Johnson* (1980) 26 Cal.3d 557 [162 Cal.Rptr. 431, 606 P.2d 738].)

1. *Appellant's personal use of a firearm.*

Relying on *People* v. *Walls* (1978) 85 Cal.App.3d 447 [149 Cal. Rptr. 460], appellant argues that the evidence is insufficient to sustain the jury in "reasonably rejecting" the possibility that the rifle changed hands and that codefendant Gaitan in fact used the weapon within the meaning of Penal Code section 12022.5. (See *People* v. *Bassett* (1968) 69 Cal.2d 122, 139 [70 Cal.Rptr. 193, 443 P.2d 777].) Appellant contends that since no one actually saw him shoot the victims, the jury could not properly find him guilty beyond a reasonable doubt.

Appellant's reliance on *Walls* is misplaced. That case involved a burglary-robbery-rape of two victims by two defendants where a firearm clearly changed hands on at least two occasions. The court concluded that under the circumstances there was insufficient evidence to conclude that one of the defendants had the firearm in his possession during the robbery of a specified victim. The instant case is clearly distinguishable since no evidence indicates that the rifle in question was ever in the possession of Ruben Gaitan. In addition, Gaitan apparently entered the walk-in refrigerator on only one occasion at the beginning of the robbery whereas appellant entered and emerged numerous times. Accordingly, the evidence is manifestly sufficient to support the jury's finding that appellant personally used a firearm in the commission of the murder.

2. ▆▆▆ *Murder in the course of robbery.*

Appellant's second claim is equally meritless. He begins by citing *People* v. *Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468] for the proposition that "it [is] not enough for the jury to find the defendant guilty of a murder *and* one of the listed crimes; the statute also require[s] that the jury find the defendant committed the murder 'during the commission of or attempted commission of' that crime." (*Id.*, at p. 59, italics in original.) From this assumption he asserts that the robbery in this case was completed before the killing took place, and therefore that the murder was not perpetrated "in the commission of" a robbery within the meaning of Penal Code section 190.2, subdivision (a)(17).

It is well established that the crime of robbery continues beyond the point in time when the property is taken from the victim. (See *People* v. *Laursen* (1972) 8 Cal.3d 192, 199-200 [104 Cal.Rptr. 425, 501 P.2d

1145] and cases there cited.) In the instant case, the killing occurred at the same location as the robbery and within a short time after the money was taken from the safe. Moreover, the jury could well have concluded that the purpose of the killing was to eliminate a witness to the robbery. Under the circumstances, there is overwhelming evidence from which a jury could find that the killing was perpetrated "in the commission of" a robbery.

H. *Appellant was properly convicted of two counts of robbery.*

Appellant was convicted in separate counts of the robbery of Parrott and the robbery of Pickrell; both robberies were enhanced by a finding that he used a firearm in the commission of the crime. Appellant argues that because there was but one taking of property, he can only be convicted of one robbery. The cases on which he relies suggest that, with respect to the other victim, the court should reduce the conviction to assault with a deadly weapon.

As a general rule, even though a defendant entertains but a single principal objective during an indivisible course of conduct, he may be convicted and punished for each crime of violence committed against a different victim. (See *People v. Miller* (1977) 18 Cal.3d 873, 885 [135 Cal.Rptr. 654, 558 P.2d 552] and cases there cited.) Robbery is recognized as a crime of violence against the person. (See *People v. Miller, supra*, 18 Cal.3d 873, 880; *People v. Guerin* (1972) 22 Cal.App.3d 775, 781-782 [99 Cal.Rptr. 573].) Thus when the defendants in *People v. Childs* (1980) 112 Cal.App.3d 374 [169 Cal.Rptr. 183] took money at gunpoint from five bank tellers, they were convicted of five separate robberies. (*Id.*, at pp. 382, 383.) The foregoing principles would indicate that appellant was properly convicted of the robberies of both Parrott and Pickrell.

Several Court of Appeal decisions, however, have held that the forceable taking of a single item of property from the joint possession of two victims constitutes only one robbery. Arbitrarily selecting one of the victims as the robbery victim, those decisions reduce the offense against the other victim to the allegedly lesser included offense of assault with a deadly weapon.

In the first such case, *People v. Guerin, supra*, 22 Cal.App.3d 775, defendant was convicted of the robbery of two liquor store clerks and Simon, the store manager. Quickly affirming the conviction as to each

clerk on the ground that each had separate dominion over his own cash register, the court balked as to Simon. "As manager," it observed, "he was in at least constructive possession of all the money in both registers.... But when the prosecution elected to charge Reifel and Miss Ward [the clerks] as additional victims of the takings, it found itself in the position of charging two robberies for each taking.... [H]ad defendant been guilty only of theft, such a result could not have been permitted. We do not think that it can be permitted here." (*Id.*, at p. 782.) The court then reduced the conviction as to Simon to assault with a deadly weapon, "an offense included within the crime of robbery in the first degree." (*Id.*, at pp. 782-783.)

In the next case, *People v. Higgins* (1972) 28 Cal.App.3d 771 [104 Cal.Rptr. 925], defendants at gunpoint compelled two clerks to remove money from the same cash register. The same panel of the Court of Appeal as had decided *Guerin* relied on that case in holding that defendants could have been convicted of robbing either clerk, but not both; it then reduced the offense as to one clerk to assault with a deadly weapon.

In both *Guerin* and *Higgins*, the defendants were convicted of first degree robbery. The use of a deadly weapon was an essential element of first degree robbery, a fact upon which the court relied in finding assault with a deadly weapon was a lesser included offense. The 1976 Legislature, however, amended section 211a to eliminate the degrees of robbery, which raised anew the question of lesser included offenses. In *People v. McGreen, supra*, 107 Cal.App.3d 504, the Court of Appeal addressed that issue, and held that a charge of robbery plus an allegation that defendant used a firearm in the commission of the robbery encompassed the lesser offense of assault with a deadly weapon.

Finally, *People v. Childs, supra*, 112 Cal.App.3d 374, applied the *McGreen* analysis to a case of multiple robbery convictions. In *Childs*, as we noted earlier, defendants committed separate robberies of each of the bank tellers. On leaving the bank, defendants accosted a pickup truck, ordered the driver (Negoli) and the passenger (Lazar) out of the vehicle, and fled in the truck. The court stated that "both victims were in possession of the same vehicle and were victims of a single taking. Therefore, the additional count charging [defendant] for robbery of Negoli must be modified in light of the robbery conviction sustained against Lazar. Since both Negoli and Lazar were victims of an assault,

the conviction on Count III (robbery of Negoli) must be modified to assault with a deadly weapon pursuant to *Guerin*." (*Id.*, at p. 383.)

It is clear that each of the two subsequent cases (*Higgins* and *Childs*) relied heavily on the *Guerin* court's reasoning in concluding that a single taking from two victims constitutes but one robbery. We find that reasoning suspect.

*Guerin* explicitly recognized that Penal Code section 654's prohibition of multiple punishment for a single criminal act did not bar conviction and punishment for two counts of robbery when the multiple victims were involved. (22 Cal.App.3d at p. 780.) Without actually acknowledging what it was doing, the *Guerin* court in effect chose to read the robbery statute (Pen. Code, § 211)[15] to require multiple takings in order to sustain multiple convictions. We do not read the legislative intent so narrowly. Robbery is not merely the felonious taking of personal property. Such a taking, without more, is only theft. To constitute robbery the property must be removed from the possession and immediate presence of the victim against his will, and such removal must be by force or fear. When two or more persons are in joint possession of a single item of personal property, the person attempting to unlawfully take such property must deal with all such individuals. All must be placed in fear or forced to unwillingly give up possession. To the extent that any threat may provoke resistance, and thus increase the possibility of actual physical injury, a threat accompanied by a taking of property from two victims' possession is even more likely to provoke resistance.

We view the central element of the crime of robbery as the force or fear applied to the individual victim in order to deprive him of his property. Accordingly, if force or fear is applied to two victims in joint possession of property, two convictions of robbery are proper.[16]

I. *The instant case is an inappropriate vehicle for re-examination of the felony-murder rule.*

Relying on the recent decision of the Michigan Supreme Court in *People* v. *Aaron* (1980) 409 Mich. 672 [299 N.W.2d 304], appellant in-

---

[15]Section 211 provides as follows: "Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."

[16]To the extent they are inconsistent with this opinion, *Guerin, Higgins* and *Childs* are hereby disapproved.

vites us to reexamine the underpinnings of the felony-murder rule in California. For the time being, however, we choose to decline the invitation since the facts of the instant case make it an inappropriate vehicle for such a re-examination. The record in the guilt and penalty phases strongly suggests that the jury viewed the killing in this case as intentional and malicious. It is thus unlikely that the giving of the felony-murder instruction worked to appellant's detriment.

We therefore rely on extensive and well-settled precedent in affirming appellant's first-degree murder conviction under circumstances where a felony murder theory was presented to the jury. (See, e.g., *People v. Burton* (1971) 6 Cal.3d 375, 388 [99 Cal.Rptr. 1, 491 P.2d 793]; *People v. Lindley* (1945) 26 Cal.2d 780, 791 [161 P.2d 227]; *People v. Doyell* (1874) 48 Cal. 85, 94-95.) We do not suggest that a reexamination of such precedent may not be appropriate under other circumstances.[17]

### III. PENALTY PHASE ISSUES

The 1978 Death Penalty Initiative added the fifth paragraph of section 190.3 to the Penal Code. It provides: "The trier of fact shall be instructed that a sentence of confinement to state prison for a term of life without possibility of parole may in the future after sentence is imposed, be commuted or modified to a sentence that includes the possibility of parole by the Governor of the State of California." The statute requires that this instruction, popularly known as the Briggs Instruction, be given at the penalty phase of every special circumstance case conducted pursuant to the 1978 law.

In the instant case the court instructed the jury in the language of the second paragraph of CALJIC No. 8.84.2, which implements the statute: "You are instructed that under the State Constitution, a Governor is empowered to grant a reprieve, pardon, or commutation of a sentence following conviction of a crime. Under this power, a Governor may in the future commute or modify a sentence of life without possibility of parole to a lesser sentence that would include the possibility of parole."

---

[17]Appellant also contends that the 1978 death penalty law is unconstitutional because it allows for the imposition of capital punishment without a determination that the defendant intended the death of the victim where the first degree murder conviction is based on a felony-murder theory. In view of our conclusion that the penalty determination must be reversed due to the unconstitutionality of the Briggs Instruction, we need not express an opinion on this additional contention.

We shall point out, after examining the background of the Briggs Instruction and the history of similar instructions, that the Briggs Instruction cannot withstand constitutional analysis. In the first place, it invites considerations that are foreign to the jury's task of determining whether the defendant should live or die. Instead of assuring that the jury's life-or-death decision rests on "consideration of the character and record of the individual offender and the circumstances of the particular offense" (*Woodson* v. *North Carolina* (1976) 428 U.S. 280, 304 [49 L.Ed.2d 944, 961, 96 S.Ct. 2978]; *Lockett* v. *Ohio* (1978) 438 U.S. 586, 603-608 [57 L.Ed.2d 973, 988-992, 98 S.Ct. 2954]), the instruction focuses the attention of the jury on the fact that the Governor has the power to render the defendant eligible for parole if the jury does not vote to execute him. The jury's induced consideration of this possibility leads it into an area where it has no guidelines and in which its conclusion must be entirely speculative. In this realm, the jury's life-or-death sentencing decision may be based at least in part on the jurors' perception of the present or some future governor's philosophy or possible action, rather than on the defendant's crime, his character and his record. The challenged instruction thus improperly leads the jury far beyond the constitutional safeguards of due process of law.

The instruction suffers from a second and perhaps deeper constitutional flaw. Although it tells the jury that a sentence of *life without possibility of parole* may in the future be modified by the Governor to permit parole, it neglects to tell the jury that *a sentence of death* may likewise be modified by the Governor to permit parole. The jurors are thus misled into believing that if they vote for life without possibility of parole the Governor may still commute or grant parole, but not told the same powers reside with the Governor if they vote the death penalty. The jury is left with the mistaken belief, because of this omission, that the only sure way to keep the defendant off the streets is to condemn him to death.

A. *The Briggs Instruction violates the Constitution by inviting the jury to consider an extraneous and speculative factor in deciding whether or not to impose the death penalty.*

The Briggs Instruction appears to be unique among the 38 states which have capital punishment statutes currently in effect.[18] The impro-

---

[18]The Massachusetts death penalty law, recently declared unconstitutional on independent state grounds in *District Atty. for Suffolk Dist.* v. *Watson* (1980) — Mass. —

priety of the statute, however, becomes clear from a review of the numerous decisions which have condemned comparable instructions or prosecutorial comment advising or permitting the jury to consider the possibility of pardon or parole in deciding what sentence is to be imposed upon the convicted defendant.

Almost 20 years ago, in *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810], this court held prejudicially erroneous an instruction that told the jury that in deciding whether or not to impose the death sentence upon a convicted defendant it should consider the possibility that the Governor might commute the sentence or that the prison authorities might eventually grant defendant parole.

Prior to *Morse*, trial courts in California were permitted to instruct jurors about the possibilities of pardon or parole in order to "afford [to the jury] the pertinent facts 'to assist it in assessing the significance of a life sentence.' [Citation.]" (*Id.*, at pp. 637-638.) The *Morse* jury was similarly instructed: "'In making your determination as to the penalty to be imposed, you may, in exercising your discretion to choose between different punishments, consider as a possible consequence that the law of this state provides a defendant sentenced either to death or life imprisonment may be pardoned or have his sentence reduced by the Governor and that if this defendant is sentenced to life imprisonment he may be eligible for parole at the expiration of seven calendar years. A trial judge may also reduce the penalty from death to life imprisonment.' (CALJIC No. 306 (rev.).)" (*Id.*, at p. 636.)

We addressed two separate issues in *Morse*. As to instructions regarding the possibility of parole, we noted that "[t]he objective situation is difficult enough without blurring the functions. The function of the jury is to consider the facts surrounding the crime and the defendant's background, and upon that basis, reach its decision. The jury should not be invited to decide if the defendant will be fit for release in the future; it should not at all be involved in the issue of the time, if any, when the defendant should be released; ... placing such issues before the jury ... in substance, transposes the task of the Adult Authority to the jury." (*Id.*, at p. 643.) The opinion recognized the state interest in assuring that jurors do not engage in erroneous speculation based on

[411 N.E.2d 1274], also did not contain any mandated instruction similar to the Briggs Instruction.

incorrect preconceptions; it held that the jury could be informed as to the general operation of the parole procedure, but then should be specifically instructed not to speculate as to what the Adult Authority might do. (*Id.,* at p. 648.)

We secondly considered the effect of instructions which informed the jury of the Governor's power to commute the death sentence and the trial court's power to reduce a death sentence to a sentence of life imprisonment, concluding that "[b]oth statements tend to diminish the jury's sense of obligation; they both infuse into the issue factors which do not belong there. . . . [W]e believe that [such] instructions . . . tend to mislead the jury into assuming that the rendition of the penalty initiates a chain of proceedings by the court and the Governor which will achieve a reweighing of the sentence and possibly produce its nullification." (*Id.,* at pp. 652-653.) The opinion held that such instructions should not be given, but that the jury should be informed as to the "general scheme of our parole system" and carefully cautioned that "the matter of parole is not to be considered by you" and particularly that "[I]t would be a violation of your duty as jurors if you were to fix the penalty of death because of a doubt that the Adult Authority will properly carry out its responsibilities."

The *Morse* case exemplifies the multitude of decisions in this country which condemn comments by a judge or prosecutor regarding the possibility of pardon or parole since such allusions introduce irrelevant factors into the jury's consideration of the sentencing issue. "The prevailing view in this country, with which we agree, is that a jury charged with the responsibility of assessing the penalty to be suffered by the accused should not be invited, by instruction or argument, to speculate on the possible effect of pardon or parole upon the execution of the sentence imposed." (*State* v. *Atkinson* (1970) 253 S.C. 531 [172 S.E.2d 111, 112]; see also *State* v. *Lindsey* (W.Va. 1977) [233 S.E.2d 734, 736-738].)

Although some early cases found such error to be nonprejudicial (e.g., *Grandsinger* v. *State* (1955) 161 Neb. 419 [73 N.W.2d 632, 651]; *McMann* v. *State* (Fla. 1951) 55 So.2d 538, 539-540), the general current rule holds that jury consideration of such possibilities works automatic prejudice. (E.g., *State* v. *Lindsey* (La. 1981) 404 So.2d 466, 484-488; *Bush* v. *State* (1977) 261 Ark. 577 [550 S.W.2d 175, 177]; *Sukle* v. *People* (1941) 107 Colo. 269 [111 P.2d 233, 235]; see also *Lovely* v. *United States* (4th Cir. 1948) 169 F.2d 386, 391.) In some ju-

risdictions, mere mention of the possibility of pardon or parole constitutes grounds for reversal. (E.g., *Hinton* v. *Com.* (1978) 219 Va. 492 [247 S.E.2d 704, 706].) In others, jurors may be generally informed of the possibility of pardon, but then must be specifically instructed not to consider it in reaching their verdict. (E.g., *State* v. *White* (1958) 27 N.J. 158 [142 A.2d 65, 76-77]; *Commonwealth* v. *Aljoe* (1966) 420 Pa. 198 [216 A.2d 50, 55, 16 A.L.R.3d 1126].)

The courts of Virginia and West Virginia have vividly pointed out the vice of misleading a jury into the belief that it must sentence a defendant to death in order to avoid the possibility that otherwise a coordinate branch of government might reduce the sentence and permit the defendant to go at large. In *Jones* v. *Commonwealth* (1952) 194 Va. 273 [72 S.E.2d 693, 35 A.L.R.2d 761], the jury requested assurance from the judge that if they sentenced defendant to life imprisonment, he would not "get out." "The court told the jury that 'it could not give that assurance; that would be in the hands of the executive branch of government and that the court was of the judicial branch; that you and I represent the judicial branch and have nothing to do with that.'" (*Id.*, at p. 694.) In reality, defendants sentenced to life imprisonment were ineligible for parole; the only way a defendant so sentenced could "get out" would be a pardon by the Governor. The majority of the Virginia Supreme Court recognized that the comment by the trial judge misled the jury because it suggested that defendants sentenced to life imprisonment might be eligible for parole. (*Id.*, at p. 696.) The court reversed the sentence of death imposed by the jury, relying upon the proposition that the trial court should never inform the jury that a lawfully imposed sentence may be reduced by a coordinate branch of government.

The West Virginia Supreme Court of Appeals in *State* v. *Lindsey, supra,* 233 S.E.2d 734 reached a similar result. There, the jury was instructed that if it recommended mercy, defendant would be "'*entitled* to parole under the applicable statute of the State of West Virginia.'" (*Id.*, at p. 738; italics in original.) The court noted that a convicted defendant "is never *entitled* to parole. [Citation.] He is eligible to be considered for parole." (*Id.*, at p. 739.) The opinion continues: "The jury is the trier of facts and 'there is no presumption that they are familiar with the law.' [Citation.] ... We cannot presume that the jury knows the law and the instruction given to it, being extremely misleading, doubtless induced that jury to convict without a mercy recommendation.... We must conclude that such instruction, being inaccurate,

misleading and incomplete, operated to the detriment of the defendant and constituted reversible error." (*Id.*; see also *State* v. *Tudor* (1950) 154 Ohio St. 249, 43 Ohio Ops. 130 [95 N.E.2d 385, 391] (dis. opn. of Hart, J.); *State* v. *Brooks* (1978) 271 S.C. 355 [247 S.E.2d 436, 438-439].)

Thus the Virginia and West Virginia courts condemn the above instructions because they suggest that the jury's sentence may be nullified by another branch of government; thus the instructions blur the constitutional lines that separate the judicial from the executive powers of the state. The Supreme Courts of Kentucky and Louisiana have likewise held that instructions that lead the jury to consider the possibility of executive pardon or parole violate the constitutional principle of the separation of powers.[19] In similar vein the Tennessee Supreme Court has concluded that such procedure impairs the constitutional right of defendant to a fair trial.[20]

We recognize that *Morse* itself did not invoke these constitutional principles and relied primarily upon this court's power to supervise lower courts. As we explain, however, the United States Supreme Court's recent death penalty decisions make it clear that in the context of capital sentencing, the flaws exposed by *Morse* effect a constitutional dimension.

The United States Supreme Court has now established that in capital cases the Eighth Amendment requires that the decision whether a defendant is to live or die must be based upon "consideration of the character and record of the individual offender and the circumstances

---

[19]In *Broyles* v. *Commonwealth* (Ky. 1954) 267 S.W.2d 73, 76-77, the court stated: "Under our theory of separation of governmental powers, it is the duty of the judiciary to obtain a conviction of those guilty of crime. But once that conviction has been obtained and the sentence imposed, it is the duty of other departments of government to enforce the sentence and to determine when and under what circumstances the prisoner will be eligible for release.... [Thus,] the parole of prisoners falls within another department of government, and a discussion of the subject has no place in an argument to a jury." In *State* v. *Lindsey, supra*, (La.) 404 So.2d at page 487, the court said, "The jury could conclude that the governor will improperly pardon dangerous offenders or commute their sentences, thereby encouraging it to pre-empt the governor's power and defeat the constitutional design by opting for the death penalty."

[20]The Tennessee Supreme Court in *Farris* v. *State* (Tenn. 1976) 535 S.W.2d 608, 614 suggested that "[j]urors should not be permitted to speculate on the length of sentences, discretionary parole, ... and a whole conglomeration of events which, if they come to pass at all, will come to pass in the future. Very heavily involved is the constitutional right of a defendant to a fair trial."

of the particular offense." (*Woodson* v. *North Carolina, supra,* 428 U.S. at p. 304 [49 L.Ed.2d at p. 961]; *Lockett* v. *Ohio, supra,* 438 U.S. at pp. 603-608 [57 L.Ed.2d at pp. 988-992].)

Quite clearly, the Briggs Instruction does not direct the sentencing jury's attention to any of these constitutionally relevant considerations. Instead, it injects into the sentencing calculus an entirely irrelevant factor, the possibility of a gubernatorial commutation or pardon, that bears no relationship to the character or record of the individual offender or to the circumstances of the particular offense. Moreover, the jury's consideration of this factor must necessarily be entirely speculative, for the jury obviously cannot determine at the penalty trial whether the present or some future governor will or will not commute a particular sentence imposed on the defendant. Thus, the effect of the Briggs Instruction may be to lead the jury to base its life-or-death decision at least in part on a speculative prediction of possible future gubernatorial action, rather than on the defendant's crime, his character and his record.

As we have seen, even in noncapital cases the vast majority of American jurisdictions preclude a jury from considering the gubernatorial pardon power in determining an appropriate criminal sentence. In a capital case, this general principle rises to a constitutional predicate. As the United States Supreme Court has explained: "Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." (*Woodson* v. *North Carolina, supra,* 428 U.S. at p. 305 [49 L.Ed.2d at p. 961].)

The Briggs Instruction, by injecting an irrelevant and speculative consideration into the penalty determination, diverts the jury's attention from the central issue and thereby "creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." (*Lockett* v. *Ohio, supra,* 438 U.S. at p. 605 [57 L.Ed.2d at p. 990]. See also *Beck* v. *Alabama* (1980) 447 U.S. 625, 638, 642 [65 L.Ed.2d 392, 403, 405-406, 100 S.Ct. 2382].)

B. *Since the Briggs Instruction is partial, incomplete and misleading it induces the jury to apply the death penalty improperly and in violation of the Constitution.*

In addition to confusing the jury with irrelevant information, the Briggs Instruction misleads the jurors by telling them only half the story.[21] They are informed that if a sentence of life without possibility of parole is imposed, that sentence may in the future be commuted or modified by the Governor to a lesser sentence which includes the possibility of parole. The jury is *not* informed that a sentence of death may be similarly commuted or modified. The implication which results from this omission is clear: a sentence of life without possibility of parole does not mean incarceration for life; it may be commuted or modified. Thus the only way to be sure that the defendant is never again let loose upon society to repeat his vicious crime is to impose a sentence of death.

The danger of the Briggs Instruction, and the misleading inferences which may be drawn from it, finds ample illustration in the facts of the instant case. The instruction enabled the prosecutor to argue to the jury as follows: "When the death penalty was voted in there were certain considerations that the jurors were going to be asked to take into account and to weigh them, and if the scale went one way it was appropriate for the death penalty and if it goes the other way then it's appropriate for life without parole, *which does not quite mean that, and we'll get to that when we describe the instructions.*" (Italics added.)

The instruction also encouraged the prosecutor to elicit some particularly prejudicial testimony on cross-examination from Dr. Sheffner, the defense psychiatrist. The prosecutor first asked the doctor whether the appellant was aware of the possibility of parole by way of a gubernatorial commutation, were he to receive a sentence of life imprisonment. The doctor replied that appellant was aware of the possibility, although

---

[21]Not only is the instruction a half-truth in the practical sense, but were it part of a contractual negotiation, it would arguably constitute a tortious deceit and a fraudulent misrepresentation. Civil Code section 1710, subdivision 3 defines a deceit as "[t]he suppression of a fact, by one ... who gives information of other facts which are likely to mislead for want of communication of that fact...." (See also Civ. Code, § 1572, subd. 3; Rest.2d Torts, § 529.) While the considerations which govern private conduct as opposed to governmental conduct are admittedly different in many cases, we would condone an anomaly if we were to uphold this instruction and in essence authorize state-sanctioned fraud and deceit in the most serious of all state actions: the taking of a human life. (See *Gardner* v. *Florida* (1977) 430 U.S. 349 at p. 358 [51 L.Ed.2d 393 at p. 402, 97 S.Ct. 1197].)

he viewed the chances as rather remote. The prosecutor then inquired as to the defendant's state of mind were he to be released on parole after 10 or 20 years in prison. (30) (See fn. 22.) The doctor testified that defendant answered that he would probably have built up within himself such feelings of anger and frustration that he would attempt to take revenge on anyone involved in the trial, including the district attorney who prosecuted the case, the judge who presided over it, and the jurors who voted to convict him.[22] Thus, the jurors in this case were not only misled in the abstract; they were given a very personal motive to insure that defendant was never released. And the Briggs Instruction through its misleading implication suggested that the only way to attain this "permanent" result was a sentence of death.[23]

Decisions of the United States Supreme Court hold that procedures biased in favor of the death penalty cannot withstand constitutional challenge; the Briggs Instruction results in the scales of justice being "tipped toward death." In *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], the court stated that "[o]ne of [the basic requirements of procedural fairness] is that the decision whether a man deserves to die must be made on scales that are not deliberately tipped toward death." (*Id.,* at pp. 521-522, fn. 20 [20 L.Ed.2d at p. 785].) The court concluded: "The State of Illinois has stacked the

---

[22]This testimony was marginally relevant to explain the basis of Dr. Sheffner's conclusion that appellant had congenital brain damage evidenced by primitive and illogical thinking. The Attorney General also asserts that the testimony was independently relevant as bearing on appellant's state of mind at the time of the crime and on his character in general. Even relevant evidence, however, may be excluded by the trial court "if its probative value is substantially outweighed by the probability that its admission will ... create substantial danger of undue prejudice...." (Evid. Code, § 352.)

A trial court ruling admitting evidence under section 352 may be reviewed only to determine whether the court abused its discretion. (See *People* v. *Kelley* (1977) 75 Cal.App.3d 672, 678 [142 Cal.Rptr. 457].) Although courts have rarely found an abuse of discretion, our opinion is that the present case constitutes one of those rare exceptions. The probative value of the testimony was insignificant; Dr. Sheffner had other grounds for his diagnosis, and could cite other examples of defendant's "primitive thinking." And even if marginally relevant on independent grounds, its prejudicial effect was substantial, particularly when considered in connection with the jury instruction on the Governor's commutation power. Weighing the danger of prejudice against the probative value, we conclude that the testimony should not be admitted if the penalty phase is retried.

[23]In *Morse*, we quoted one commentator whose observation is equally pertinent to the instant case: "'[T]he fact that a person sentenced to life might be released before he may safely be returned to society indicates a weakness in the parole system—not that he ought to have been executed.' (Knowlton, *Problems of Jury Discretion in Capital Cases* (1953) 101 U.Pa.L.Rev. 1099, 1119.)" (60 Cal.2d at p. 644, fn. 10.)

deck against the petitioner. To execute this death sentence would deprive him of his life without due process of law." (*Id.*, at p. 523 [20 L.Ed.2d at pp. 785-786].)

A death penalty that rests upon considerations or information improperly received by the trial court denies to defendant due process of law. Thus in *Gardner* v. *Florida, supra,* 430 U.S. 349 the Supreme Court was confronted with a death penalty case in which the trial judge stated that he relied in part on information in a presentence investigation report, including confidential information which was not disclosed to counsel for the parties. The court pointed out the two factors that led to its reversal of the judgment: "First . . . [i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion. [¶] Second, it is now clear that the sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause."

Holding that the record must disclose to the reviewing court the considerations which motivated the death sentence, the court held, "Without full disclosure of the basis for the death sentence, the Florida capital-sentencing procedure would be subject to the defects which resulted in the holding of unconstitutionality in *Furman* v. *Georgia.*" This deliberation by the trial judge based upon considerations improperly introduced vitiated the judgment because it violated the guarantees of due process of law.

Although the information denied to the defendant in *Gardner* was concededly relevant and presumptively reliable (430 U.S. at p. 359 [51 L.Ed.2d at p. 403]), we deal in the instant case with information which is concededly irrelevant and clearly unreliable. Basing the finding of death upon such irrelevant and unreliable considerations the Briggs Instruction biases the jury in favor of death and "stacks the deck" against defendant. To uphold a death sentence predicated on this type of procedure would violate *Witherspoon*, vitiate *Gardner*, and make a mockery of defendant's protection of due process of law.

In an attempted answer to these solid objections to the Briggs Instruction the People urge that the instruction neither leads to misunderstanding nor works any effect at all. The People point out that the jury does not enjoy an unlimited discretion in determining whether to impose death or life without possibility of parole, but are instructed to "consid-

er ... the applicable aggravating and mitigating circumstances, to weigh them and to reach a decision based on such findings." The People therefore would dismiss as in "no way a factor" the specific instruction that the "governor is empowered to grant a reprieve, pardon or commutation" and that "under this power, a Governor may in the future commute or modify a sentence of life in prison without possibility of parole to a lesser sentence." The People go so far as to assert that the jury "was impliedly told not to consider" this instruction as to the Governor's power, and that the instruction as to aggravating and mitigating circumstances somehow obliterates the instructions as to the Governor's powers.

Yet the offending instruction is the penultimate instruction in a lengthy exposition of mitigating and aggravating factors, and strongly remains in the minds of the jurors in deciding upon death or parole. The jurors are informed at this crucial point that the only way to keep the offender off the streets is to liquidate him. Yet, says the People, the jurors do not "consider this factor in reaching their decision"! The People would apparently erase this last and potent thrust toward the penalty of death on the grounds that the jurors are instructed to consider *other* instructions in addition to the Briggs Instruction and that, in any event, the jurors may already be aware of the Governor's commutation power.

In short, the People argue that the Briggs Instruction serves merely to tell the jurors what they already know, and has little, if any, effect on their deliberation and decision. We question the premises on which this argument rests; we do not believe that jurors are generally aware of the scope of the Governor's commutation power, or that the jury instructions on aggravation and mitigation will necessarily nullify the harm done by the Briggs Instruction. Indeed, the People's argument is belied by the history of the Briggs Instruction: surely, the draftsmen would not have taken the extraordinary step of commanding trial courts to give a specific instruction if they believed the instruction would have no significant effect whatsoever on the verdict.

We therefore hold that the Briggs Instruction constitutes a dual violation of defendant's due process rights as guaranteed by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.[24] By encouraging the jury to consider an irrelevant and confusing

---

[24]Whether or not the Briggs Instruction also independently violates one or more provisions of the California Constitution is an issue we need not decide.

factor in their deliberations, the instruction reduces the reliability of any resulting sentencing determination. This vice is compounded by the practical effect of the instruction in biasing the jury in favor of the death penalty by suggesting—totally incorrectly—that the only way that the jury can ensure that the convicted defendant will not be released from custody through the Governor's commutation power is by imposing a sentence of death.

Although the dissent perceives no harm to the defendant from the incomplete and misleading Briggs Instruction, we find it unquestionably prejudicial. A juror who is faced with a choice of a verdict of life without possibility of parole or of death and who is troubled by the fortuity that the defendant may be released by a commutation or pardon granted by the Governor, is told by the judge that such release can indeed occur if the juror selects life without possibility of parole. Under the Briggs Instruction, however, the judge does not tell the juror that such release can also occur if the juror selects a sentence of death. Thus, a juror who is concerned about the effects of a possible commutation or pardon could reasonably, but erroneously, conclude from the Briggs Instruction that the only way to prevent such a commutation or pardon is to return a verdict of death. Thus, the instruction through a deception may lead a juror to vote for death although the juror believes that the verdict should be lifetime confinement in prison. In short, the instruction erroneously, deceptively and unconstitutionally tilts the verdict toward death.

Finally, the dissent contends that a ruling of this court that the death penalty not be inflicted unless constitutionally rendered would impose too great a burden upon the judicial system. To do so might cause a number of decisions to be reversed. But the Briggs Instruction affects only penalty trials, not trials determining a defendant's guilt, and the guilt trials entail the greatest expenditure of time and money. In any event, conjectures as to the burden of retrials are speculative; we do not know what instructions were given in these cases and we do not know whether the instructions as actually rendered were proper.

Surely, if the State of California exacts the death penalty, it has no license to take a human life based upon an improper and unconstitutional verdict of death. A human life cannot be balanced against the costs to the state of conducting a fair trial. If the state is to execute an individual, it must not do so on the basis of a verdict of death tainted by

a misleading, deceptive, unconstitutional instruction, but upon a proceeding that clearly complies with due process of law.

The judgment is reversed insofar as it relates to penalty. In all other respects the judgment is affirmed.

Bird, C. J., Mosk, J., Newman, J., Kaus, J., and Broussard, J., concurred.

RICHARDSON, J.—I concur in the majority opinion to the extent that it affirms defendant's conviction of first degree murder, attempted murder and robbery. I respectfully dissent, however, from the majority's reversal as to penalty.

Under the 1978 death penalty law, the trial courts are required to inform the jury at the penalty phase that a sentence of life imprisonment without possibility of parole subsequently may be commuted or modified by the Governor. The majority concedes that this instruction *correctly* states the law. It finds, however, that the instruction violates defendant's due process rights. *This holding will require the reversal of every death sentence heretofore imposed in those jury trials which have been conducted under the 1978 law*, assuming, as we must, that the trial court followed the mandate of that law and gave the requisite instruction. Scores of capital cases will face retrial. (Approximately 90 judgments of death have been filed with this court subsequent to the enactment of the 1978 law at issue here.) I respectfully suggest that only if a *constitutional* defect clearly and unmistakably appears should we require such a colossal reexpenditure of judicial resources. No such defect is involved here.

As we recently observed, the death penalty laws, as with all legislation, are presumed constitutional and will be upheld unless their invalidity "clearly, positively and unmistakably" appears. (*People v. Jackson* (1980) 28 Cal.3d 264, 317 [168 Cal.Rptr. 603, 618 P.2d 149]; see *In re Dennis M.* (1969) 70 Cal.2d 444, 453 [75 Cal.Rptr. 1, 450 P.2d 296].) In similar fashion, in appraising the constitutionality of initiative measures such as the 1978 death penalty law, we should resolve *all* doubts in favor of the use of the initiative process if we can reasonably do so. (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 248 [149 Cal.Rptr. 239, 583 P.2d 1281].) Significantly, the majority cites no cases whatever which suggest that it would be *unconstitutional* to instruct the jurors in a capital

case regarding the Governor's commutation power. Indeed, as discussed below, most cases acknowledge the self-evident fact that the Governor's authority to commute or reduce a criminal sentence is a matter of common knowledge. That being so, the giving of the challenged instruction must be considered harmless and nonprejudicial.

The majority first criticizes the ·instruction on the basis that it induces the jury to "speculate" regarding irrelevant penalty factors. (*Ante*, p. 596.) To the contrary, the instruction is purely informational, explaining to those jurors who might otherwise be misled that a sentence denominated "life imprisonment without possibility of parole" is nonetheless subject to possible commutation by the Governor. (See *Summers* v. *State* (1970) 86 Nev. 210 [467 P.2d 98, 100], approving a similar informational instruction.) Clearly, the instruction does not advise or encourage the jury to reach its verdict in reliance upon this information. Indeed, the jury is separately instructed regarding the sole and limited factors which are to be considered and weighed in determining the proper penalty; the Governor's commutation power is *not* included among these factors. (See Pen. Code, § 190.3, subds. (a)-(k).)

Moreover, even if the instruction did advise the jury to consider the commutation power in making its determination, on what proper basis could such an instruction be deemed unconstitutional? It is true that some prior cases have suggested that the consideration of the possibility of subsequent administrative grants of parole raises an extrinsic factor which might confuse the jury or diminish its sense of responsibility. (E.g., *People* v. *Morse* (1964) 60 Cal.2d 631, 643, 652-653 [76 Cal. Rptr. 391, 452 P.2d 607].) Yet unlike the situation in those cases, here the issue of parole is necessarily presented to the jurors by the very language of the alternative punishment being considered by them, namely, "life without possibility of parole." (Pen. Code, § 190.) Moreover, *Morse* involved no *statute* which mandated the giving of such instruction, and its holding appears to rest not on constitutional grounds but upon this court's inherent power to supervise the lower courts *in the absence of contrary legislation.* Surely, the people of this state, who are the ultimate sovereign, in adopting legislation of this kind by initiative, are entitled to disagree with and override our view of the relevance of information which might be of concern to the jurors in a capital case.

The majority suggests, however, that the instruction mandated by the 1978 law is incomplete in its failure to advise the jury that the Governor may commute a sentence of death as well as a sentence of life

without possibility of parole. It is difficult to understand how or why a defendant would ever desire such an instruction, which could only lead the jurors to minimize the seriousness and severity of the death penalty as a choice of punishment. Indeed, in *Morse, supra*, we expressly *disapproved* a similar instruction, on the basis that it "may very well induce the jury to assume that its finding for the death penalty merely initiates a series of procedures which invoke a reconsideration of the penalty and which may result in its reduction to life imprisonment. [¶] ... The impact of the instruction *must necessarily weaken the jury's own sense of responsibility*." (60 Cal.2d at p. 649, italics added.)

Incredibly, the majority now *invalidates* the 1978 death penalty law for its failure to require an instruction of a type *condemned* by us in *Morse*. Such a capricious conclusion makes no sense.

The majority insists, however, that the challenged instruction tells the jurors only "half the story," implying thereby that a death sentence is "the only way to be sure that the defendant is never again let loose upon society to repeat his vicious crime." (*Ante*, p. 597.) Assuming for purposes of argument that some jurors may exist who base their penalty decision upon such factors, it is highly unlikely that any such jurors would choose the *lesser* penalty upon being advised of the Governor's power to commute a death sentence. Thus, from the defendant's standpoint, no tactical reason whatever exists for requesting an instruction on that issue.

Finally, as many of the cases make clear, it is likely that most jurors already know of the Governor's commutation power. Several courts have recognized that the availability of parole and commutation in capital cases is readily understood among lay persons. (See *State* v. *Carroll* (1937) 52 Wyo. 29 [69 P.2d 542, 560]; *State* v. *Cherry* (1979) 298 N.C. 86 [257 S.E.2d 551, 561]; *Grandsinger* v. *State* (1955) 161 Neb. 419 [73 N.W.2d 632, 651], cert. den. 352 U.S. 880 [1 L.Ed.2d 81, 77 S.Ct. 104]; *Paramore* v. *State* (Fla. 1969) 229 So.2d 855, 860; *Sullivan* v. *State* (1936) 47 Ariz. 224 [55 P.2d 312, 318-319].) *Cherry* involved juror discussion and consideration of the possibility of subsequent parole by administrative bodies. The North Carolina Supreme Court noted: "We see little prejudice to defendant since the possibility of parole *or executive clemency* is a matter of common knowledge among most adult persons." (P. 561, italics added.) The same conclusion was expressed more forcibly by the Nebraska Supreme Court in *Grandsinger*, another capital case, wherein the court observed that the

prosecutor's comments regarding the availability of pardon or parole "was simply a statement of existing ... law which all men, including the jurors, were presumed to know and doubtless did already know about before the statement was made." (P. 651.) The *Grandsinger* court concluded that "It would be a perversion of truth and justice" to hold that the prosecutor's comments required reversal of the death penalty rendered in that case. (*Ibid.*)

In the present case, the majority's reversal of the judgment as to penalty is similarly improper, resting as it does upon a highly unlikely chain of speculation that some jurors were (1) previously unaware of the full extent of the Governor's commutation powers and (2) chose the death penalty only after learning that the Governor may commute a sentence of life imprisonment without possibility of parole. Given the jurors' probable prior knowledge, such a circumstance, in my view, would be highly unlikely.

In sum, the people of this state by adopting the 1978 death penalty initiative have determined that, although probably widely known, the jurors in capital cases nonetheless should be informed of the Governor's power to commute a sentence of life imprisonment without possibility of parole. The majority's contrary views as to the *wisdom* of such an instruction afford no basis for declaring the law, established by the people's initiative, *unconstitutional.*

I would affirm the judgment in its entirety.

Respondent's petition for a rehearing was denied February 24, 1982, and the opinion was modified to read as printed above. Richardson, J., was of the opinion that the petition should be granted.