Filed 6/4/13  P. v. Richard CA1/5

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **THE PEOPLE,** | |
| **Plaintiff and Respondent,** | **A131685** |
| **v.** | |
| **DALE DWAYNE RICHARD,** | **(Contra Costa County** |
| **Defendant and Appellant.** | **Super. Ct. No. 05-090525-7)** |

Defendant Dale Dwayne Richard (appellant) appeals from a judgment of conviction on multiple felony offenses, seeking reversal based on instructional error and prosecutorial misconduct.  In addition, he contends the trial court improperly endorsed the prosecutor's argument regarding an element of count ten, effectively directing a verdict on that count.  We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On May 22, 2009, a Contra Costa County Grand Jury returned a bill of indictment charging appellant with the following felony offenses against Luis Soqui on February 5, 2009:  first degree residential robbery (Pen. Code, §§ 211, 212.5, subd. (a))[1] (count one); kidnapping (§ 207, subd. (a)) (count two); attempted forcible oral copulation (§§ 288a, subd. (c)(2), 664) (count three); attempted willful, deliberate, and premeditated murder (§§ 187, subd. (a), 664, subd. (a)) (count four); criminal threats (§ 422) (count eight); false imprisonment by violence (§§ 236, 237, subd. (a)) (count nine); and assault with intent to commit a felony (oral copulation) during the commission of a first degree

---

[1]  All undesignated section references are to the Penal Code.

1

burglary (§ 220, subd. (b)) (count ten). In addition, the indictment charged appellant with a February 5, 2009 first degree residential robbery (§ 211, 212.5, subd. (a)) of James Johnson (count five).[2] As to each count, the indictment alleged that appellant had personally used a firearm in the commission of the offense. (§§ 12022.53, subd. (b); 12022.5, subd. (a)(1).) Appellant entered a plea of not guilty to all counts.

On January 6, 2010, prior to the commencement of trial, appellant's trial counsel declared doubt as to appellant's mental competency and ability to assist in his own defense. (§ 1368, subd. (b).) The trial court suspended criminal proceedings against appellant and appointed psychologist Jules Burstein under Evidence Code section 730 to examine appellant and make findings concerning his competency in accordance with the procedures set forth in Penal Code section 1368. After reviewing appellant's records from a prior hospitalization and his psychiatric records at the Jail Mental Health Service, meeting with appellant, and interviewing his mother by telephone, Dr. Burstein found appellant was competent to stand trial. Among other statements in his report, Dr. Burstein related "[appellant] has a demonstrated history of manipulative and defiant behavior in the jail setting which is much more compatible with individuals suffering from Drug or Alcohol-related disorders or Personality Disorders, than with psychotic disorders." Dr. Burstein indicated that appellant "was coherent throughout my interview with him. I saw no evidence of internal preoccupations, nor of any delusional thinking, nor of any peculiarities of speech or behavior." Dr. Burstein concluded, however, that appellant "may be inclined to feign mental illness . . . as a way of demonstrating his *unwillingness* to stand trial."[3] On February 8, the trial court deemed appellant competent

---

[2] The indictment also charged appellant with two offenses committed on February 13, 2009, receiving stolen property (§ 496, subd. (a)) (count six), and misdemeanor petty theft (§§ 484, 488) (count seven), which were later dismissed.

[3] Dr. Burstein noted an incident at the Jail Mental Health Clinic on February 6, 2009, in which appellant threw toilet paper and other items and loudly demanded a phone call and food. Jail records indicate that appellant, who was "alert, clear and lucid," stated, " ' "I'm going to keep this up until I get a phone call and food," ' " then started "howling and kicking" the doors. Dr. Burstein also noted a February 18 incident in which appellant stated, " 'I thought I'd get out sooner if I was 5150'd.' "

to stand trial and reinstated the criminal proceedings, finding appellant "is presently able to understand the nature and purpose of the proceedings taken against him and is able to assist and cooperate with counsel in presenting a defense."

Trial commenced on November 1, 2010. On November 18, a jury found appellant guilty of all counts and found true the allegations he used a firearm in committing the offenses. As to count four, the jury found appellant did not act willfully, deliberately, and with premeditation.

The trial court sentenced appellant to a term of life in state prison with the possibility of parole for count ten, and imposed consecutive terms totaling 21 years 8 months for counts four and five and the related firearm enhancements.[4]

Appellant filed a timely notice of appeal from the judgment of conviction.

Because of the nature of appellant's appellate arguments, we provide an abbreviated recitation of the evidence presented at trial.

*The Prosecution's Case*

1. *Offenses Against Luis Soqui*

Soqui testified that at approximately 11:30 p.m. on February 5, 2009, he arrived at the apartment complex where he lived in Pittsburg. As Soqui was walking up the stairs to his apartment, appellant came out of the bushes, followed him up the stairs, and asked him for a lighter. Soqui told appellant he did not smoke, then turned and continued walking up the stairs. Appellant said, "Hey," and when Soqui turned back, appellant pointed a gun at his face and said, "Give me your money." Soqui said he did not have any money and took out his wallet to show appellant. Appellant asked what Soqui had in his apartment, and Soqui replied he did not have much. Appellant said, "We gonna find out. Let's go." Soqui entered his apartment, and appellant followed, keeping the gun pointed at him. Once inside, appellant locked the door and told Soqui, " 'If you try anything, I'm going to shoot you right now.' "

---

[4]  The trial court imposed a concurrent term of 14 years for count one and the related firearm enhancement (§ 12022.53, subd. (b)), and stayed the sentences for counts three, eight, and nine under section 654.

Appellant then went into the bathroom.  Soqui heard a "metal to metal sound" "like[] bullets going inside a revolver."  When appellant came out of the bathroom, he pointed the gun at Soqui and started looking through the bedroom drawers, asking Soqui if he had any money.  Soqui said he did not have any money.  Appellant stood up and put the gun to Soqui's chest, pulled the hammer back, held the gun there for 15 seconds, and pulled the trigger.  Soqui heard a click, but the gun did not fire. Soqui wrestled with appellant and pinned him against a window.  Appellant said, "Okay.  Okay." and stopped fighting.  Soqui told him, "Take anything you want.  Just let me go."  Appellant searched the bedroom and living room and took Soqui's jewelry, including a silver chain with a "P" emblem and diamond earrings.  Appellant ran to the kitchen, grabbed an eight-inch knife and some garbage bags, and returned to the bedroom.  He told Soqui, "Just put everything in the bags."  Soqui complied.

Appellant then sat down on a computer chair, with the gun in one hand and the knife in the other.  He "was looking right at [Soqui]" and told Soqui "to suck his dick." Soqui said, "[M]an to man, just let me go . . . .  You get all the things you want . . . .  I won't go to the police or nothin'.  Just let me go."  Soqui started walking towards the apartment door.  Appellant stood up and said, "Fuck your man to man.  Suck my dick." Soqui saw that appellant's penis "was just hangin' out" of his pants.  When Soqui reached the door, appellant said, "I'm not playin'.  I'm not playin.'  I'm going to shoot. I'm going to shoot."  Soqui told him, "You know what, I'm not gay, dude.  Go ahead, shoot me," and started to open the door.  With the gun in one hand and the knife in the other, appellant ran to get between Soqui and the door.  Soqui pushed appellant out of the apartment and was able to shut the door.

Soqui waited two minutes, grabbed a knife for protection, then ran to his car and drove to tell police.  A short time later, he flagged down a police officer.

2. *Joseph Finister*

Joseph Finister testified that at about 12:15 a.m. the same night, he heard banging on the door of his apartment in Pittsburg.  When he got up to see who it was, appellant asked him to come out.  Finister declined and closed the door.

4

3. *Robbery of James Johnson*

Appellant subsequently went to the apartment of Melissa Waldecker. Waldecker's boyfriend, Johnson, testified that he and Waldecker were smoking outside her apartment around 12:30 a.m. Johnson said appellant "came at [him] and pointed a gun at [him]," and told him to empty his pockets and "[g]ive me everything you got." Johnson said he did not have any money but had "some trees" (i.e., marijuana). Appellant took Johnson's wallet and cell phone and told him to get the marijuana. Johnson and Waldecker went inside the apartment; appellant walked behind them with his gun pointed at Johnson. As they entered, Waldecker went to the living room; Johnson went to a bedroom in the back and shut the door. Appellant tried to force the door open, but Johnson held it shut. Waldecker corroborated Johnson's testimony. She saw appellant run out carrying her DVD player.

4. *Subsequent Events That Night*

John Aliotti testified that just after 12:30 a.m. the same night, appellant knocked on the door of his apartment at 161 Diaz Circle in Pittsburg. When Aliotti opened the door, thinking appellant was a neighbor, appellant said he was lost and asked for directions. Appellant pulled his jacket back, and Aliotti saw that he had a gun in his right hand. The gun was pointed at Aliotti's chest. Aliotti slammed the door, and his wife called 911.

Appellant then went to the home of his aunt, Catherine Jones, who also lived on Diaz Circle. Jones testified that appellant asked her if she wanted a DVD player, but she told him she did not want it "and to get it out of [her] house." She agreed to give appellant a ride home, and they got in her son's car, a white Camaro. Appellant was riding in the back seat. Police stopped the car as she was backing out.

Pittsburg Police Officer Gabriel Palma testified that he was dispatched to 161 Diaz Circle at approximately 12:38 a.m. that night for a report of an attempted robbery at the residence. As Palma was walking to the residence from his patrol car, he noticed a white Camaro backing out of a parking stall; through the driver's window, he observed a person

5

in the back seat who matched the description of the suspect in the robbery.[5]  Palma directed the driver to stop.  After appellant exited the car, the officer saw a revolver on the seat where he had been sitting, and found it was loaded with six 45-caliber rounds.  Nothing in the gun's appearance indicated to the officer that it was not operational.  Palma found Johnson's cell phone in the car, and found Waldecker's DVD player during a consensual search of Jones's residence.  Jones told him appellant had brought it there.

A photograph taken of appellant after his arrest showed him wearing the "P" necklace taken from Soqui.

At 3:42 a.m. that night, Soqui identified two people, including appellant, as possible suspects in a photo lineup.  Johnson and Finister also identified appellant in photo lineups that night.  Waldecker identified appellant in an infield lineup; when appellant heard she had identified him, he started yelling and she recognized his voice as well.

*The Defense Case*

Catherine Currier, a criminalist at the Contra Costa County Sheriff's Office Crime Lab and an expert in firearm function and operability, testified that appellant's gun appeared operable on initial inspection and "dry firing."  Upon closer inspection, however, Currier noticed that the firing pin was broken, preventing the gun from expelling a bullet.  Currier acknowledged on cross-examination that, without her years of training, she would not have known the firing pin was broken.

Appellant testified in his own defense.  His testimony was rambling, difficult to follow, and at times nonsensical.  Respondent aptly describes it as "non-responsive and fanciful," and states, "[a] considerable portion of [t]his testimony was simply nonsensical or gibberish"; outside the jury's presence, the trial court characterized appellant's testimony as "babbling."  Appellant referred to himself repeatedly as an angel and stated, "I am the chosen one.  The chosen one.  I am God, tryin' to save the world."  He maintained a Mike June, who was a "demon," and "the devil," was "in [his] head" and

---

[5]  At trial, Palma identified the person in the back seat as appellant.

either committed the offenses, forced him to commit the offenses, or committed the offenses with him; appellant said no one saw Mike June because he was a "ghost." Appellant said he had a gun because he "was tryin' to scare the demons." He once asked, "You hear them trains?"; another time, he said, "I need my meds, man." He rocked back and forth while testifying.

Appellant said he was on drugs at the time of the alleged offenses but he essentially admitted the events alleged. At the outset of his testimony, his attorney stated, "Now you've heard all the testimony," and before he could ask a question, appellant said, "It's true. It's true. I did it, man."

Appellant admitted going into Soqui's apartment and pulling a gun on him, but said he knew the gun did not work. When asked what he did in Soqui's apartment, appellant replied, "Everything . . . that Soqui — Luis said." He admitted loading the gun and taking jewelry from Soqui's bedroom, including a "P chain" and diamonds. He denied threatening to kill Soqui but said, "The devil told him that." He denied pulling his penis out and telling Soqui to "suck [his] dick," but stated, "The devil did that. Mike June did that."

Appellant also admitted he had a gun when he went to the apartments of Finister and Johnson. He admitted he chased Johnson: "Yeah, the dude was runnin' from me, man, because I was tellin' him, 'Give me weed. Give me weed.'" Appellant said, "I had a big gun in my hand." He claimed Mike June took Waldecker's DVD player but admitted giving this item to his aunt.

Appellant contested only two of the charges — counts four and ten; defense counsel maintained in closing arguments that appellant did not intend to kill Soqui and did not assault him with the intent to commit a sex offense.

DISCUSSION

I. *The Alleged Instructional Error*

Appellant challenges Special Jury Instruction No. 225a (SJI No. 225a), which the trial court gave the jury sua sponte to address his apparent mental state during trial.[6]

A. *Relevant Background*

Noting appellant's "highly unusual conduct" while testifying, the trial court stated, "Nine out of ten lay people would sit here, listen to [appellant's testimony] and think that this was a case where they should decide sanity." "Something has to be said to the jury that they don't think they're supposed to acquit because this is the way [appellant] is now." Although the court stated its belief appellant's behavior was an "act," it expressed concern that "[a] lay jury is sitting there thinkin', 'This guy's crazy.' They don't have the experience with mental illness to know one way or the other. And I think the only instruction I have to give is that there is no issue before them as to the mental competency of this defendant on this date." Over defense objection, the trial court gave SJI No. 225a: "The jury is not to concern itself with the present mental state of the defendant. That issues lies only with the trial court and there are protections for the defendant both before and after trial. Questions of present competence of the defendant should have no part in the jury deliberations excepting as how it might effect [*sic*] evaluation of the defendant's testimony or provide evidence to determine the issues that are presented for jury determination, i.e., the situation at the time of the alleged crimes."

Immediately after giving SJI No. 225a, the trial court instructed the jury under CALCRIM No. 226, the standard instruction for determining the credibility of witnesses.

B. *Analysis*

Appellant contends the court erred in giving this instruction for several reasons.

First, he argues, in giving this instruction, the trial court improperly "singled [him] out . . . and instruct[ed] on how his evidence should be considered." (See *People v. Harris* (1989) 47 Cal.3d 1047, 1099 ["It is improper . . . for the court to single out a

---

[6]   The trial court's designation appears to reflect the placement of this instruction between CALCRIM Nos. 225 and 226.

particular witness in an instruction, since by so doing the court charge becomes a comment on how the evidence should be considered, rather than a general instruction on a defense theory"], disapproved on another ground in *People v. Wheeler* (1992) 4 Cal.4th 284, 299, fn. 10.) We disagree. The trial court's instruction reasonably informs the jury that it could consider his present competence in evaluating his testimony, but it does not instruct the jury as to how that testimony should be considered or indicate that it should be considered differently than the testimony of any other witness. CALCRIM No. 226, the neutral instruction that immediately followed SJI No. 225a, informed the jury how to consider the testimony of all the witnesses.

Appellant contends CALCRIM No. 226 would have been sufficient to guide the jury in its evaluation of witness credibility and that the trial court, in reading SJI No. 225a, suggested to the jury there were questions about appellant's present competence as a matter of law. But CALCRIM No. 226 alone would not have informed the jury whether and how it could consider the issue that appellant's behavior placed squarely before it, namely, his sanity. SJI No. 225a does so without conveying the trial court's view of his testimony.[7]

Second, appellant argues SJI No. 225a conflicts with CALCRIM No. 226, and confused the jury as to how it should evaluate witness credibility. (See *People v. Hall* (1984) 157 Cal.App.3d 538, 546 [trial court must avoid giving instructions that are

---

[7] In stating the trial court improperly suggested his testimony was not credible, appellant relies on other comments the court made during trial, including its characterization of his testimony as "very difficult testimony to report"and the following statements: "Let's ask a question and if he doesn't answer it, I'll strike it, and you can ask it again and again and again until we get an answer"; and "He's not answering the questions." The record demonstrates that these comments were accurate depictions of the events at trial, not a reflection of the trial court's opinion regarding appellant's credibility. In granting the prosecution's motion to strike appellant's rambling and unintelligible response to a question, the trial court stated, "The jury will have to decide whether this is accurate or just . . . being put on." Appellant does not assert this comment as an independent ground for reversal. He has forfeited the alleged error, in any event, by failing to raise a proper objection below. (*People v. Ramos* (1982) 30 Cal.3d 553, 576 ["a challenge to allegedly improper remarks generally may not be raised for the first time on appeal . . . ."].)

inconsistent or would tend to confuse the jury].)  We see no conflict between these instructions and no potential for confusion.  Unlike CALCRIM No. 226, SJI No. 225a simply informs the jury it may consider appellant's present mental state and competence in evaluating his testimony.  CALCRIM No. 226 instructs the jury on other considerations impacting that evaluation.**8**

---

**8**   As provided to the jury, CALCRIM No. 226 states:

"You alone must judge the credibility or believability of the witnesses.  In deciding whether testimony is true and accurate, use your common sense and experience.  You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have.

"You may believe all, part, or none of any witness's testimony.  Consider the testimony of each witness and decide how much of it you believe.

"In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony.  Among the factors that you may consider are:  [¶] How well could the witness see, hear, or otherwise perceive the things about which the witness testified?  [¶] How well was the witness able to remember and describe what happened?  [¶] What was the witness's behavior while testifying?  [¶] Did the witness understand the questions and answer them directly?  [¶] Was the witness's testimony influenced by a factor such as a bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided?  [¶] What was the witness's attitude about the case or about testifying?  [¶] Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?  [¶] How reasonable is the testimony when you consider all the other evidence in the case?  [¶] Did other evidence prove or disprove any fact about which the witness testified?

"Do not automatically reject testimony just because of inconsistencies or conflicts.  Consider whether the differences are important or not.  People sometimes honestly forget things or make mistakes about what they remember.  And also, two people may witness the same event yet see or hear it differently.

"If you do not believe a witness's testimony that he or she no longer remembers something, that testimony is inconsistent with the witness's earlier statement on that subject.

"If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says.  Or, if you think the witness lied about some things, but told the truth about others, you may simply accept the part that you think is true and ignore the rest."

Appellant argues his present mental state cannot be divorced from the jury's evaluation of his credibility, and that SJI No. 225a would have led the jury to ignore essential credibility factors stated in CALCRIM No. 226 in evaluating appellant's testimony or to leave this credibility determination to the trial court. We disagree. Even assuming, as respondent appears to concede, that SJI No. 225a is ambiguous, the question is whether there is a reasonable likelihood the jury misunderstood and misapplied the instruction. (*People v. Smithey* (1999) 20 Cal.4th 936, 963-964.) In making this determination, we view the instruction in the context of the overall charge (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 182), and presume the jurors "are intelligent persons capable of understanding and correlating all jury instructions that are given" (*People v. Phillips* (1985) 41 Cal.3d 29, 58). Applying these principles, we do not find it reasonably likely that SJI No. 225a led the jury to disregard the specific credibility factors set forth in CALCRIM No. 226 in evaluating appellant's testimony. For the same reasons, we reject appellant's contentions that (1) the jurors were confused by the court's use of the phrases "present mental state" and "questions of present competence"; and (2) the instruction violated his rights "to testify on his own behalf" and "to have his testimony judged by the same standards as the testimony of the other witnesses."

In any event, any error in giving the instruction was harmless. Whether we utilize the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) (erroneous instruction requires reversal only if it is reasonably probable the jury would have reached a result more favorable to appellant if the instruction had not been given) or the standard set forth in *Chapman v. California* (1968) 386 U.S. 18, 24 (*Chapman*) (instructional error that constitutes federal constitutional error is reversible unless harmless beyond a reasonable doubt), we conclude the overwhelming evidence of guilt in this case renders the error harmless.[9]

---

[9] We reject appellant's contention that giving the erroneous instruction requires reversal per se because, as discussed above, the instruction did not deprive appellant of his right to testify or constitute "an unwarranted intrusion into the province of the jury."

11

Finally, appellant challenges the portion of the instruction that states, "there are protections for the defendant both before and after trial," contending this statement "was incompatible with the guarantee of fundamental fairness" because it invited the jury to speculate on future events and consider the disposition of his case. He maintains this language could have led jurors to believe he had been given a break due to his mental condition before trial (i.e., lesser charges), or that he would be treated leniently after trial, allowing improper factors to influence their verdict.

"[W]hen a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.' [Citation.]" (*Shannon v. United States* (1994) 512 U.S. 573, 579, fn. omitted.) Jurors are "not to be concerned with the question of penalty, punishment or disposition in arriving at a verdict as to guilt or innocence." (*People v. Allen* (1973) 29 Cal.App.3d 932, 936.) These principles reflect the division of labor between judge and jury; as the jury's sole function is to find the facts and to decide whether the defendant is guilty of the crime charged, "[i]nformation regarding the consequences of a verdict is . . . irrelevant to [its] task." (*Shannon*, at p. 579.) "[P]roviding jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion. [Citations.]" (*Ibid.*)

SJI No. 225a does not run afoul of these principles. The challenged language does not implicate the consequences of the jury's verdict, improperly divert the jury's attention away from its task, or encourage the jury to engage in speculation regarding the outcome; indeed, the instruction states that it is for the trial court alone to determine whether the relevant protections apply and specifically directs the jury *not* to concern itself with appellant's mental state except as it relates to issues properly before it. We also observe that the trial court instructed the jury under CALCRIM No. 3550, "You must reach your verdict without any consideration of punishment." The jury is presumed to have followed this instruction. (*People v. Tully* (2012) 54 Cal.4th 952, 1047, fn. 34 (*Tully*).)

Appellant also contends the challenged language diluted the jury's sense of responsibility and rendered its verdict arbitrary by introducing "an unquantifiable factor

12

into the deliberation process." He argues the instruction could have caused jurors to resolve doubts regarding his guilt against him, "figuring that any error they made in that determination would later be tempered or corrected by other authorities." For this proposition, he relies on authority applicable to sentencing juries in capital cases, holding it is error to instruct the jury that the trial court can reduce a death sentence to life and that the governor has the power to commute a sentence because such instructions "thrust [a jury's attention] into speculation about the future action of [others]" and create a serious possibility of imposing an arbitrary sentence that is the product of the interjection an unquantifiable factor into the deliberation process. (*People v. Ramos* (1984) 37 Cal.3d 136, 157; *People v. Morse* (1964) 60 Cal.2d 631, 649; *People v. Mitcham* (1992) 1 Cal.4th 1027 1077.) Even assuming this authority is applicable during the guilt phase of a noncapital case, SJI No. 225a cannot reasonably be construed to have steered the juror's attention away from appellant's guilt or innocence, toward any future proceedings addressing appellant's mental state. The challenged language speaks only in general terms of "protections" relating to questions about appellant's mental state and does not undermine the significance of the jury's own responsibility to render a verdict; in context, the instruction simply delineates the respective responsibilities of the court and the jury.

SJI No. 225a did not render appellant's trial fundamentally unfair or deprive him of due process.

## II. *The Alleged Directed Verdict*

Appellant also argues the trial court's ruling on defense objections during argument was tantamount to a directed verdict on count ten.

### A. *Relevant Background*

Assault with intent to commit forcible oral copulation requires proof that "[t]he defendant did an act that by its nature would directly and probably result in the application of force to a person." (CALCRIM No. 890.) In her rebuttal closing argument, the prosecutor argued that she had shown assaultive conduct by "[t]he mere fact of the defendant having that knife out with that gun that night as he's sitting there in that chair, . . . Soqui on the other end. If you ask yourself did he do an act that by its

13

nature would probably result in the application of force to that person, the answer's yes. [¶] The act of pulling that knife and presenting it in front of the [victim], the fact of brandishing it alone is enough to constitute assault."

Defense counsel objected, stating, "I think that's an incorrect statement of the law." The trial court overruled the objection, stating, "I think it's an accurate statement, the first part. Brandishing is questionable though."

The prosecutor continued, "The act of pulling it out alone is enough as the judge just said. [¶] . . . [¶] [T]he People are not required to prove defendant actually touched someone. The mere fact that he had that knife, the mere fact that he could use it, the mere fact that if he got up and came towards . . . Soqui with that knife is enough to satisfy that element. He doesn't need to wield it at him. He doesn't need to come towards him. The fact that he's got it there at the ready is enough. [¶] . . . [¶] . . . The fact that he has that knife out is enough to satisfy the element of did he do an act that by its nature would directly or probably result in the application of force to someone. There doesn't need to be touching involved. He doesn't need to come at him. [¶] And I would submit to you that [Soqui] told you [appellant] had the gun, he had the knife, he said, 'Suck my dick,' and that logically . . . Soqui would be sitting there thinking, 'If I don't do what he asks, . . . I could be stabbed,' and that's enough to constitute assault under this definition."[10] Defense counsel once again objected, stating, "I believe that's an incorrect statement of the law." The court overruled the objection.

B. *Analysis*

Appellant contends the trial court effectively removed an element of the assault offense from the jury's consideration when it "indicated . . . the prosecutor had correctly stated the law by stating that the mere fact of appellant having the knife out while sitting in the chair constituted the requisite act."

---

[10] The trial court instructed the jury that it "may not consider the firearm as being used for an assault." Although appellant notes the prosecutor's mention of the gun in seeking to establish prejudice, he does not assert the mention of the gun as an independent ground for reversal.

14

" 'The Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged.' [Citation.]" (*People v. Moore* (1997) 59 Cal.App.4th 168, 179.) Instructing the jury that an element of the offense is established as a matter of law constitutes a partial directed verdict. (*People v. Lawson* (1987) 189 Cal.App.3d 741, 744.) A trial court " 'may not direct a verdict of guilt no matter how conclusive the evidence.' [Citations.]" (*People v. Figueroa* (1986) 41 Cal.3d 714, 724.) In a criminal case, " '[n]o fact, not even an undisputed fact, may be determined by the judge.' [Citations.]" (*Ibid.*)

We find no violation of these principles in this case. Unlike the authority on which appellant relies, the trial court in this case did not instruct the jury that an essential element of the offense had been established. The trial court's statement in ruling on the first defense objection can be construed only as a confirmation that the prosecutor had correctly stated the law in the argument to which the defense objected, namely, that "[t]he act of pulling that knife and presenting it in front of the [victim] . . . is enough to constitute assault." No reasonable juror would have construed the trial court's statement as a finding the act requirement had been met or concluded the court was removing the element from the jury's consideration. At most, the court's statement amounted to an additional instruction on what is required to meet the act requirement of assault.[11] Appellant has failed to present any authority or reasoned analysis showing the prosecutor misstated the law of assault.

In overruling the second defense objection, the court simply declined to find the prosecutor had misstated the law in relying on Soqui's subjective mental state to establish

---

[11] Appellant cites *Graves v. United States* (1893) 150 U.S. 118, contending "[w]hen a trial court overrules an objection to a prosecutor's misstatement of law, '[it is], in fact, as if the court had charged the jury' in accord with the prosecutor's misstatement." Even if we read *Graves* so broadly, it establishes only that the trial court effectively instructed the jury in accordance with the prosecutor's statement, not that it removed an element of the offense from jury consideration.

assault. Regardless of whether the prosecutor accurately stated the law in this regard,[12] no reasonable juror would have understood the trial court's ruling as informing the jury "the assault act element had been established as a matter of law," as appellant contends.

III. *Prosecutorial Misconduct*

Appellant contends the prosecutor committed misconduct during closing arguments by relying on facts not in evidence. The prosecutor argued that, when Soqui decided to run for it, appellant jumped up and followed him to the door and "tried to wedge himself between the door and . . . Soqui *all the while telling him,* 'I'm not playin' with you. Suck my dick.' " Defense counsel objected, contending the last statement was not in evidence. The trial court overruled the objection, stating, "I'll let the jury decide what the evidence was."

Appellant contends the prosecutor's argument constitutes misconduct because Soqui never testified that appellant said, "Suck my dick" while he was with appellant at the front door and, in fact, specifically testified that appellant made no statements at all in the doorway. He maintains this argument "gave the jury an alternative factual theory to rely upon. Jurors who had doubts that appellant committed an assaultive act by merely holding the knife while sitting in the chair, could now rely on the prosecutor's 'testimony' that appellant also said, 'Suck my dick' (while having the knife and struggling with Soqui) at the door."

Respondent concedes the prosecutor erred in making this argument, acknowledging "appellant made those statements when sitting in the chair and when approaching the doorway," not while he was wedged in the doorway. Respondent contends, however, that this error does not rise to the level of misconduct. We need not decide this question. Assuming, without deciding, that the prosecutor's statement constitutes misconduct, we find no prejudicial error under *Watson, supra,* 46 Cal.2d

---

[12] Appellant cites authority holding "it is not the subjective belief of the victim which is determinative . . . ." (*People v. Mosqueda* (1970) 5 Cal.App.3d 540, 544; accord, *People v. Griggs* (1989) 216 Cal.App.3d 734, 742.) Respondent does not address this authority, but appellant does not assert the alleged misstatement of the law as instructional error requiring reversal.

818.[13] The trial court did not endorse the prosecutor's misstatement of the evidence in overruling the defense objection; the court indicated, rather, that it was up to the jury to decide whether the alleged facts were in evidence. Defense counsel later clarified the state of the evidence during argument: "What happens after that when [appellant's] sitting in the chair? Now, this item will be a matter of dispute. [S]oqui says, 'I've had enough. I'm out of here,' goes to the door. [Appellant], while still back in the chair, says, 'I'm not playin'. I'm gonna shoot you. I'm gonna kill you.' [Appellant] runs to the door, wedges himself in between. [The prosecutor] says that he again all the way is saying, 'Suck my dick,' and that's not true. [¶] And this is the point where you may actually have to look at the transcript because what . . . Soqui said is no more statements were made at that door, nothing. No statements were made after [appellant] was on the chair and said, 'I'll kill you.' Nothing." The trial court's instructions also informed the jury: "You must decide what the facts are in this case. You must use only the evidence that was presented in this courtroom. . . . [¶] Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence. . . . Only the witnesses' answers are evidence." We presume the jury followed the trial court's instructions. (*Tully*, *supra*, 54 Cal.4th at p. 1047, fn. 34.) We therefore find no reasonable probability the jury would have reached a result more favorable to appellant on the assault charge without the alleged misconduct.

DISPOSITION

The judgment is affirmed.

---

**13** The prosecutor's statements do not rise to the level of federal constitutional error, requiring analysis under *Chapman, supra,* 386 U.S. 18. In *People v. Samayoa* (1997) 15 Cal.4th 795, 841, the court stated, " ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.]" No such pattern is alleged here, and the prosecutor's isolated misstatement of fact did not render appellant's trial fundamentally unfair.

_____
SIMONS, Acting P.J.

We concur.

_____
NEEDHAM, J.

_____
BRUINIERS, J.